**UNITED STATES of America,
Plaintiff,**

v.

**William E. THORESEN, III, and Louise
B. Thoresen, Defendants.**

**Crim. No. 41422.**

United States District Court
N. D. California.

April 21, 1967.

**600**

Cecil F. Poole, U. S. Atty., Jerrold M. Ladar, Asst. U. S. Atty., for plaintiff.

John J. Flynn, Lewis, Roca, Beauchamp & Linton, Phoenix, Ariz., George T. Davis, San Francisco, Cal., for defendant William Thoresen.

F. Lee Bailey, Boston, Mass., Benjamin Lazarow, Tucson, Ariz., for defendant Louise Thoresen.

## ORDER GRANTING MOTION FOR SEPARATE TRIALS

OLIVER J. CARTER, District Judge.

Defendants William E. Thoresen III and Louise B. Thoresen have been indicted for violation of federal firearm control laws. Counts 1–9 of the indictment charge both defendants under 26 U.S.C. § 5851 with unlawful possession of firearms as defined by 26 U.S.C. § 5848 (eight fully automatic weapons and one shotgun pistol). Counts 10 and 11 charge defendant Louise B. Thoresen alone with possession of firearms under the above statutes (a shotgun pistol and a fully automatic weapon). Counts 12 through 22, except 17, charge William E. Thoresen alone with interstate transportation of firearms as defined by 15 U.S.C. § 901 (3), and ammunition as defined in § 901 (7) (including various rifles, pistols, pistol ammunition and a cannon) having been previously convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 15 U.S.C. § 902(e). Count 17 charges Mr. Thoresen with receiving a firearm transported in interstate commerce having been previously convicted of a crime punishable by imprisonment for a term exceeding one year under 15 U.S.C. § 902 (f).

Numerous pretrial motions have been filed by the two defendants. The instant memorandum and order concerns a motion under Rule 14, F.R.Crim.P., by Mrs. Louise B. Thoresen for a separate trial from her husband William E. Thoresen.

Defendant Louise B. Thoresen argues, and this Court agrees, that she will be prejudiced by a joint trial with her husband because the marital privilege which would allow her to prevent her spouse from testifying against her cannot be effectively exercised in a joint trial with her spouse. In the view of this Court there are several aspects of this case which give the marital privilege special significance. Important elements of the offenses in this case are possession and shipment of the various firearms, et cetera. It is already apparent from the evidence taken in the pretrial motions that it will be disputed as to which of the two defendants is responsible for such possession and such shipment, and that there will be conflicting contentions by each of the two defendants. Thus, in a

joint trial, each of the defendants would be in a position of defending himself at the expense of the other. To the extent that the defenses involve testimony by either of the defendants, the testimony would be presented in spite of the right each is supposed to have under the marital privilege doctrine to prevent his spouse from testifying against him and would be produced before the same jury that would be deciding both of their cases.

In a joint trial the probability of a conflict between the right of a defendant to testify in his own behalf and the right of the respective spouses to exercise their marital privileges is likely and real, and should be avoided, if possible. Neither party cites any compelling or persuasive authority, and the Court's research has disclosed no federal cases which resolve this conflict. The state cases which have been considered turn on statutory considerations not applicable to federal courts. Rule 26 of the Federal Rules of Criminal Procedure states:

> "The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

■ The last United States Supreme Court interpretation of this language in relation to the evidentiary principle of the marital privilege is found in Hawkins v. United States, 358 U.S. 74, at 78, 79 S.Ct. 136, at 138, 3 L.Ed.2d 125 (1958), where the court said:

> "Over the years the rule has evolved from the common-law absolute disqualification to a rule which bars the testimony of one spouse against the other unless both consent."

This interpretation must be given a fair opportunity of application. In the context of this case a separate trial of the spouses is essential, not only to protect the evidentiary rules available to the spouses, but to permit them to exercise their respective rights to testify with at least the minimum hazard of the testimonial privilege being asserted.

■ The government suggests that at the joint trial the privilege should not control over the right of a defendant to testify and that the trial should proceed with appropriate jury instructions to protect the spouse not testifying similar to instructions used to protect some joint defendants from the hearsay implications of pretrial declarations or statements made by a co-defendant. The import of the instruction is to make the statement or declaration admissible only with regard to the maker, and to make it inadmissible with regard to the other defendants. Putting aside for the moment the present conflict as to the effectiveness of this instruction, an instruction to the jury to consider the testimony of each only with regard to the person testifying and not as against the other would not be a satisfactory resolution of this vexatious conflict. The purpose of the marital privilege must be distinguished from that of the hearsay rule which is to keep evidence from a jury which is of its nature not likely to be accurate. On the other hand, the purpose of the marital privilege is to keep even relevant, cogent testimony from ever being produced by a defendant's spouse because such "[a]dverse testimony given in criminal proceedings would * * * be likely to destroy almost any marriage." Hawkins v. United States, supra, 358 U.S. at 78, 79 S.Ct. at 138. Thus it is peculiar to the marital privilege that an instruction to a jury to use a witness spouse's testimony only with regard to his own guilt or innocence fails to serve the purpose the rule was designed to serve even assuming the instruction is followed by the jury to the letter.

■ It is important to the decision of this Court that in the federal courts the marital privilege seems to have retained to this date all of the vitality it was given in Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958). See: Bisno v. United States, 299 F.2d

711, 721 (9th Cir. 1961); United States v. Moorman, 358 F.2d 31, 33 (7th Cir. 1966); Ivey v. United States, 344 F.2d 770, 772 (5th Cir. 1965); Tallo v. United States, 344 F.2d 467, 469 (1st Cir. 1965).

It is true that to grant the motion for separate trials involves certain speculation: speculation that one or both of the defendants will choose to testify, and speculation that the testimony of the defendants will be in conflict. Also, an alternative exists—to wait and see if such speculations prove true as the trial unfolds and to wait until then before granting the motion for severance. However, as noted above, the evidence already presented at the pretrial motions suggests the defenses are likely to be conflicting, and the Court's present view of the case is that their interests are conflicting. In such a posture it is timely to grant the motion to sever prior to trial, and thereby avoid the trial difficulties and prejudices which these conflicts might engender. Furthermore, the wait and see alternative offers little consolation to a party while he is attempting to prepare his defense.

Thus, if the marital privilege to prevent one spouse from testifying against the other is to be effectuated in this case where the co-defendants are husband and wife and their defenses are likely to be conflicting, it is the opinion of this Court that a severance prior to trial is the only appropriate vehicle.

Accordingly, it is ordered that the charges against Mrs. Louise B. Thoresen be severed from the charges against William E. Thoresen, III, for the purposes of the trial in this matter. January 15, 1968, at 2:00 o'clock p. m. is hereby set for hearing on the trial dates of both cases.

### ORDER DENYING MOTION FOR A CHANGE OF VENUE

This is the second memorandum and order on the group of pretrial motions in the above entitled case. The charges in the indictment of these two defendants have been described previously in a memorandum and order granting a motion for separate trials dated January 15, 1968. This memorandum passes on the motion of defendant William E. Thoresen, III to change venue.

Subsequent to the filing of the previous memorandum and the hearings on the other pretrial motions, Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (U.S.Jan. 29, 1968) was handed down by the United States Supreme Court. The *Haynes* case, supra, holds "that a proper claim of the constitutional privilege against self-incrimination provides a full defense to prosecutions either for failure to register a firearm under [26 U.S.C.] § 5841 or for possession of an unregistered firearm under [26 U.S.C.] § 5851." Haynes v. United States, supra, 88 S.Ct. at 732. Mr. William E. Thoresen, III in Counts 1–9 and Mrs. Louise B. Thoresen in Counts 1–11 have been charged with possession of unregistered firearms under § 5851. Both defendants have claimed their privilege against self-incrimination in motions to dismiss the above enumerated counts. Accordingly, these counts will be dismissed, and the present memorandum and order will treat with the motion as to the remaining counts in the indictment, Counts 12–22, which charge Mr. Thoresen alone with violation of 15 U.S.C. § 902(e) and (f), interstate transportation of firearms by a person convicted of a crime punishable by imprisonment for a term exceeding one year.

The motion for a change of venue is under Rule 21(a), F.R.Crim.P. The motion is based primarily on the belief of the defendant that there has been so much publicity regarding different aspects of this case and the background of the defendant and his wife that he cannot have a fair trial in this district. A hearing was held on the motion. Numerous exhibits were filed with the Court, and the government has entered into certain stipulations regarding the kind, quality, and the extent of the publicity.

Rule 21(a) F.R.Crim.P. provides that, "[t]he court upon motion of the defend-

ant shall transfer the proceeding as to him to another district * * * if the court is satisfied that there exists in the district * * * where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." Further definition has been given to this rule in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966):

> " * * * [W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." Sheppard v. Maxwell, supra, 384 U.S. at 363, 86 S.Ct. at 1522.

The Court will consider the motion for change of venue as to the remaining defendant, William E. Thoresen, III, with these rules in mind, and after reviewing all the exhibits and having heard the testimony, this Court finds that in spite of the volume of publicity regarding the Thoresens and their case before this Court, the content of the publicity, the type of crime with which he is charged, and likely reasons for the public interest in the case are such that it still appears that he can receive a fair trial in this district.

The publicity in this case began on April 22, 1967 and has continued with varying intensity up to the present date. It should be noted that the intensity of the publicity has been diminished by reason of a newspaper strike in San Francisco during the hearings on these pre-trial motions. The phases deemed most important by the news media have been covered in front page stories, television news stories with film clips, and radio news-casts. Less newsworthy aspects appeared in the newspapers off the front pages and to a lesser extent on television. The case has attracted an unusual amount of publicity, and anyone living in the bay area surrounding San Francisco who regularly reads one of the three major newspapers or watches the evening news on television must have been exposed to the case.

Almost all aspects of this case have received at least some coverage in the newspapers of this area. The first headline news story appeared on April 22, 1967, and described the execution of a search warrant at the defendants' home in San Francisco and the finding of a large cache of arms by federal authorities. Stories during the next few days covered the arrest of the two defendants and the execution of further search warrants and the uncovering of more arms. Early in May the California State Assembly Criminal Procedures Committee approved a new gun control bill, and news articles on that subject generally referred to the Thoresen case. During May the Thoresens appeared in Court several times for arraignment, for determination whether each of the defendants should have a mental examination, for the setting of bail, and other normal criminal pretrial matters. The news media followed these events in detail.

Television film clips during this time had pictures of the arms and the seizure of them by federal agents. Film clips also contained interviews with the United States Attorney, an Assistant United States Attorney, Mr. and Mrs. Thoresen, and their respective lawyers. Many of the newspaper stories in April and May of 1967 included with varying degrees of detail the family background of the two defendants and the criminal background of Mr. Thoresen.

From early June to the middle of August the publicity subsided significantly, basically because events in the case were few and not particularly exciting. However, on August 18, 1967, Mr. Thoresen was arrested in Las Vegas on charges of assault and battery of a woman in a hotel room and bribery in connection with that arrest. These events and the consequent revocation of Mr. Thoresen's bail by this Court were covered in detail by the news media and created a considerable volume of public-

ity. By the middle of September Mr. Thoresen was again free on bail, the Las Vegas charges had been dismissed, and the publicity subsided except for further chronicling of the more mundane events of the several court appearances since that time.

The aspect of the case which received the most extensive coverage was the quantity of the arms and ammunition which was uncovered upon the execution of the several search warrants at various locations in San Francisco and Oakland. Along with the news reports of these discoveries was speculation regarding the purpose for the gathering of so many arms by the defendants, usually including theories that the arms were for arming minutemen or revolutionary movements in this country, or for supporting some foreign intrigue. It is significant that this speculation was, every time it appeared, admitted to be just speculation. As no further evidence regarding the reasons for such a cache was forthcoming from "sources" of the news media, speculation turned to the possibility that the defendant William E. Thoresen was an unusually avid gun collector. This latter idea was vigorously supported by Mr. Thoresen's previous counsel in interviews with newsmen all through April and May.

The aspects of the case which received the next greatest volume of publicity were the arrests and court appearances of the defendants in late April and May. The third heaviest coverage was of the Las Vegas incident. Both of these have already been described above.

In the view of this Court there are three somewhat related aspects of this case and its publicity which form the basis for the decision that the defendant has not been significantly prejudiced and that he can still receive a fair trial.

First, the defendant has not been charged with a vicious, evil or frightening crime. Rather it is a violation of a regulatory statute designed to control arms movement.

Next, the public interest attracted by this case is not one of antipathy or of indignant desire for retribution and quarantine associated with mobsters or vicious murderers. Rather the public interest is more one of a detached curiosity over an unusual series of events which do not present any immediate danger to the public or any need for indignation. The news media have not expressed editorial opinion or even inferential opinion that there was need for retribution or some legal action that wasn't already being taken.

Third, the force of any prejudicial publicity was lessened by the fact that most of the prejudicial subject matter was not accentuated in the articles in which it appeared and by the fact that the publicity on most of these matters abated before June 1967, eight months before the scheduled date of the trial in this case.

The timing of the most prejudicial publicity was concentrated in the period following the first uncovering of the cache of arms on April 22 to the end of May. During this time details of all of Mr. Thoresen's "brushes with the law" (involving fist fighting, evading arrest, setting off explosives, and assaulting a woman in Los Angeles) were printed in several newspaper stories. One particularly inflammatory article appeared on May 3, 1967 in the San Francisco Chronicle. In it some of the testimony of the California Deputy Attorney General, Charles A. O'Brien, before the California Criminal Procedures Committee of the Assembly is quoted. The testimony was volunteered on behalf of a bill then before the committee which provided for additional controls on arms. The quoted portion was part of an argument that such controls were necessary to prevent a man with a record like Mr. Thoresen's from having possession of heavy arms like those seized from Mr. Thoresen's home. In setting forth Mr. Thoresen's record of arrests and psychiatric history Mr. O'Brien seems to have drawn on every derogatory criminal charge, police report, and probation report available to his office. Similar articles apparently appeared in some other cities, but the

long derogatory record was not repeated by news media at any time after that date.

Knowledge of these details by a juror might be prejudicial because this background material might easily be the basis for an inference that Mr. Thoresen is continually having scrapes with the law and that being such a fitful and erratic person his possession of arms is particularly dangerous and therefore to be particularly condemned. However, the criminal charges and the extremely derogatory police report in connection with one of the charges were printed in only three or four different stories, and were near the end of each of them, off the front page. None of these brushes with the law were carried on television or radio, and all mention of them ceased before June 1967.

There were two criminal incidents in Mr. Thoresen's life which did receive special attention in the news media. The first is the prior felony conviction which provides a necessary element for Counts 12–22 of the indictment, shipping (and receiving) arms in interstate commerce having previously been convicted of a crime punishable by more than one year in prison. The conviction involved the theft of some travel posters from a ferry terminal in Bar Harbor, Maine. Since proof of this conviction will be required as part of the government's case in Counts 12–22, prior publicity involves merely an accurate statement of the charges against him.

The second prior criminal incident receiving much publicity is that of the Las Vegas charges. The facts of the Las Vegas incident cannot be proper evidence at trial. To the extent that a member of the jury from his knowledge of these criminal charges inferred that Mr. Thoresen was an erratic and recalcitrant man with a dangerous hobby, he would be prejudiced. However, such prejudice is speculative, and the publicity on this subject abated before the end of September. Accordingly, this Court is of the opinion that the Las Vegas publicity even though potentially prejudicial will not prevent Mr. Thoresen from having a fair trial. In addition it should be noted that the Las Vegas publicity was the result of Mr. Thoresen's own conduct over which the government had no control, and in which it did not participate.

By contrast there has been extensive publicity regarding facts which this Court feels has not been prejudicial. The finding of the huge cache of arms by federal authorities at a home owned by the Thoresens has been so extensively publicized that many of the veniremen are likely to have been exposed to those facts. At the pretrial hearings the evidence has shown that the seizure of these arms, the type of arms found, and the places where they were seized will not be the subject of much dispute. Where, dispute will arise is over the question of who was responsible for shipping the arms in the charges now before the Court. On this key issue which will be before the jury for determination, there has been almost no public discussion, and therefore no public prejudice on the question to be decided.

In summary, it is the view of this Court that for the most part the news media have restricted their coverage of this case to reporting factual incidents and that they have avoided almost completely any vituperative comment. Regarding the publicity of facts that are admissible anyway or of evidence on issues that are not likely to be disputed, there is no reason to find that prejudice has resulted. The facts that would not be admissible at a trial and which by themselves are potentially prejudicial were not reported repeatedly, were not emphasized, and in the face of the broad spectrum and large volume of the other facts reported, they assume only minor significance.

Defendants have argued that the United States Attorney and the Assistant United States Attorney who have been handling this case have been the source of so much of the publicity that the United States should be estopped to raise any objection to a change of venue. The evidence does not support defendants'

contention. The appearances of the government attorneys in the publicity structure were not prejudicial. Under all the circumstances it must be found that their participation in the total publicity was minimal.

■ Defendants have also argued in this same vein, that where it is found as a fact that some of the pretrial publicity complained of has resulted from the complicity or the tacit assent of the United States Attorney's office or of the federal agents involved in said prosecution, the defendants should be entitled to a change of venue even though it might not be found as a fact that the pretrial publicity has created a likelihood that a fair and impartial trial cannot be obtained in the community. Defendants have not cited any authority to support this argument. This Court holds that the proposition does not state the law as it is now, and it lacks sufficient logic to convince the Court that it should be the law.

One possible source of prejudice that has not yet been considered by the parties in this case is the current national dispute over the merits of stricter government control and regulation over possession of firearms. In such a setting there is a possibility that some prospective jurors will bring to trial a fixed opinion on the subject of firearms regulation. A pro-gun advocate may feel strongly that every man has a right to bear arms. An anti-gun person may feel that the futility and danger of possessing a gun is such that only evil people have guns. The problem does not bear particularly on the motion for a change of venue because the possibility of running into this kind of juror would be the same anywhere in the nation. However, the Court does feel that it is proper to note that in a western city such as San Francisco the general sentiment is more likely to be sympathetic to the right to have arms, and therefore favorable to the defendant's case than in an eastern city. The solution to this problem lies in careful voir dire examination of the jurors during their selection.

Indeed it is the opinion of this Court that a careful voir dire examination will be more than adequate to discover the few jurors who will have been so exposed to the publicity in this case that they will be aware of the incidents that appear to be most prejudicial.

■ Accordingly, it is ordered that this motion for a change of venue be, and the same is hereby denied.

## ORDER DENYING MOTION TO CONSOLIDATE OR ALTERNATIVELY TO REQUIRE ELECTION AS TO COUNTS 12–22

This memorandum and order concerns a motion by the defendant William E. Thoresen, III in the above-entitled case described as a "Motion to consolidate or in the alternative to require prosecution to elect as to Counts 12–22." Defendant objects to what he terms an " * * * attempt * * * by the government to convert that which, on its face, must be one, or at the most several, counts into eleven separate criminal activities * *." The attack centers on three pairs of counts involving charges of violations of Title 15 U.S.C. § 902(e) and (f). Section 902(e) prohibits transportation of a firearm in interstate commerce by a person convicted of a crime punishable by imprisonment for a term exceeding one year. Counts 14 and 15 charge Mr. Thoresen (who is alleged to have such a conviction) with shipping two firearms respectively from a single point of origin to a single destination on the same date. Counts 18 and 19 also charge Mr. Thoresen with shipping two firearms respectively from a single point of origin to a single destination on one date, the origin, destination, and date being different from those in Counts 14 and 15. Whether or not the two firearms were in the same shipment has not been set forth.

Section 902(f) of Title 15 prohibits receiving a firearm which has been shipped in interstate commerce by a person convicted of a crime punishable by imprisonment for a term exceeding one year. Count 16 charges Mr. Thoresen with shipping in interstate commerce,

and Count 17 charges receiving from interstate commerce the same firearm. The remainder of the Counts, 12, 13, 20, 21 and 22, charge not only different firearms, but apparently different shipments.

With regard to Counts 13 and 14 and Counts 18 and 19 and any other count where more than one offense is charged for one shipment under the same statute defendant has a valid point. Rayborn v. United States, 234 F.2d 368 (6th Cir. 1956) involving a situation where a defendant had been convicted under § 902(e) on different counts for each of several different firearms and different kinds of ammunition transported simultaneously on a single trip from Louisville, Kentucky to Buffalo, New York, held that "the reasoning of the Supreme Court's opinion in [Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955)] points clearly to the conclusion that a fugitive who transports several firearms and ammunition on an interstate journey is guilty of a single crime." This Court finds the reasoning and the authority of *Rayborn*, supra, very persuasive, and feels obliged to follow its holding.

As the indictment is presently worded it is not certain which of the counts involve only one shipment or transportation. The United States will be required to elect from or consolidate the counts of the indictment so that no more than one offense under the appropriate statute is stated for each shipment or transportation.

With regard to the counts which do involve different interstate journeys, there is no authority to indicate that these cannot properly be treated as separate offenses.

With regard to Counts 16 and 17 the fact that they charge transportation and receipt of one firearm that traveled on a single journey does not mean that two offenses are not involved where the charges in the two counts fall under two different statutory provisions. The rule to be applied to this question was laid down in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) and was affirmed in Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958):

> "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Blockburger v. United States, supra, 284 U.S. at 304, 52 S.Ct. at 182.

Sections 902(e) and (f) will each require proof of an element which the other does not. Section 902(e) will require proof that defendant was the person who did the transporting of the firearm in interstate commerce. Section 902(f) will require proof that the defendant received the firearm which had been transported in interstate commerce.

Using the same test Wilson v. Taylor, 295 F.2d 527 (10th Cir. 1961) held that two separate offenses were stated under subsections (e) and (g) (interstate transportation of a stolen firearm by any person) of § 902, even though only one act of interstate transportation was involved. The different elements were the criminal status of the defendant under (e) and the stolen nature of the firearm under (g). There appears to be no significant basis for distinguishing the holding in Wilson v. Taylor, supra, from the issue presently under consideration. Thus this Court must hold that Counts 16 and 17 state separate offenses, and that they are properly divided into two counts.

Accordingly, it is ordered that plaintiff elect from or consolidate Counts 12–22 to state no more than a single offense under the appropriate statute for each interstate shipment or transportation.

It is further ordered that defendant's motion directed at reducing further the number of counts be, and the same is hereby denied.

**608**

ORDER DENYING MOTION TO DIS-
MISS COUNT 17 AS BASED ON
AN UNCONSTITUTIONAL STAT-
UTE.

Defendant William E. Thoresen, III
has moved to dismiss Count 17 of the
indictment pending against him on the
ground "that the statute upon which such
Count is based (Title 15 U.S.C. Sec. 902
(f)), is unconstitutional as containing a
presumption which deprives the defend-
ant of his constitutional right to a fair
trial." Def.'s Motion to Dismiss Count
17, at 1.

Section 902(f) reads as follows:

"(f) It shall be unlawful for any per-
son who has been convicted of a crime
punishable by imprisonment for a term
exceeding one year or is a fugitive
[sic] from justice to receive any fire-
arm or ammunition which has been
shipped or transported in interstate or
foreign commerce, and the possession
of a firearm or ammunition by any
such person shall be presumptive evi-
dence that such firearm or ammunition
was shipped or transported or received,
as the case may be, by such person in
violation of this chapter." 15 U.S.C.
§ 902(f).

■ The simple answer to defendant's
contention is that while § 902(f) does
contain a clause which creates a presump-
tion which has been declared unconstitu-
tional in Tot v. United States, 319 U.S.
463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943),
this clause is properly severable from the
remainder of the statute. This Court
adopts the below quoted portion of an
opinion in Velazquez v. Hunter, 159 F.2d
606 (10th Cir. 1947) which deals with
the same contention:

"Tot v. United States, 319 U.S. 463, 63
S.Ct. 1241, 87 L.Ed. 1519, held that the
portion of § 2(f) of the Act which
created a presumption of transporta-
tion from the fact of possession, vio-
lated the due process clause and was
unconstitutional. It does not follow
from the decision that the remainder
of § 2(f) is invalid. In Loeb v. Colum-
bia Township Trustees, 179 U.S. 472,

at page 490, 21 S.Ct. 174, at page 181,
45 L.Ed. 280, the court said: 'As one
section of a statute may be repugnant
to the Constitution without rendering
the whole act void, so, one provision of
a section may be invalid by reason of
its not conforming to the Constitution,
while all the other provisions may be
subject to no constitutional infirmity.
One part may stand, while another will
fall, unless the two are so connected,
or dependent on each other in subject-
matter, meaning, or purpose, that the
good cannot remain without the bad.
The point is not whether the parts are
contained in the same section, for the
distribution into sections is purely arti-
ficial, but whether they are essentially
and inseparably connected in substance,
—whether the provisions are so inter-
dependent that one cannot operate
without the other.' [See, also Berea
College v. Commonwealth of Kentucky,
211 U.S. 45, 55, 29 S.Ct. 33, 53 L.Ed.
81.]

"Because the portion of § 2(f) creating
the unconstitutional presumption is
clearly separable from the remainder of
the section, the latter did not fall with
the unconstitutional portion of the sec-
tion. Further, the Act contains a
separability clause. [15 U.S.C.A.
§ 908] Such expressions of the inten-
tion of Congress will be given effect
by the courts whenever possible.
[Weller v. People of State of New
York, 268 U.S. 319, 325, 45 S.Ct. 556,
69 L.Ed. 978; Board of Trade of City
of Chicago v. Olsen, 262 U.S. 1, 42, 43
S.Ct. 470, 67 L.Ed. 839; Keller v.
Potomac Elec. Power Co., 261 U.S. 428,
444, 43 S.Ct. 445, 67 L.Ed. 731]" Vel-
azquez v. Hunter, supra, at 607 and
608.

■ Count 17 states an offense under
15 U.S.C. § 902(f) without any reliance
upon the presumption in that statute. It
will be the duty of this Court to see that
the unconstitutional presumption is not
used against the defendant at trial, and
this will fully protect defendant's rights
in this respect.

Accordingly, it is ordered that defendant's motion to dismiss Count 17 because it is based on an unconstitutional statute be, and the same is hereby denied.

## MEMORANDUM ON MOTIONS TO DISMISS

Pending before the Court are defendants' motions to dismiss. In Counts 1–9 the defendants Louise B. Thoresen and William E. Thoresen, III are charged jointly with the possession of unregistered firearms in violation of Title 26 U.S.C. § 5851. In addition, the defendant Louise B. Thoresen is charged in Counts 10 and 11 with the same type of offense and under the same statute.

Both of the defendants have claimed their privilege against self-incrimination in their respective motions to dismiss the above enumerated Counts, and both have called the attention of the Court to the cases of Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923; Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906. The opinions in these cases were filed by the Supreme Court of the United States on January 29, 1968, and they make it abundantly clear that unless modified they will require the dismissal of the challenged Counts of the indictment.

In this respect *Haynes* states:

"We hold that a proper claim of the constitutional privilege against self-incrimination provides a full defense to prosecutions either for failure to register a firearm under § 5841 or for possession of an unregistered firearm under § 5851."

 With the defendants' claim of privilege having been made, and the Court deeming it to be a real and substantial claim on behalf of each of the defendants making the claim, it would appear that the Court has no other course but to dismiss Counts 1–11 of the indictment which charge violations of § 5851.

It is, therefore, ordered that Counts 1–9 of the indictment be dismissed as to both of the defendants, and that Counts 10 and 11 be dismissed as to the defendant Louise B. Thoresen.

## ORDER DENYING MOTION TO SUPPRESS

William E. Thoresen and Louise B. Thoresen have moved to suppress all evidence seized upon the execution of a search warrant for the premises at 2801 Broadway, San Francisco, on April 21, 1967 by agents of the United States Treasury Department and/or agents of the Alcohol and Tobacco Tax Division of the Treasury Department. The Counts in the indictment which charge Mrs. Louise B. Thoresen having been dismissed, the motion will be considered as to Mr. Thoresen.

Thoresen bases his motion on the charge that the affidavit for the search warrant was inadequate because it failed to state probable cause and further that even if this Court should find probable cause on the face of the affidavit, the affiant wilfully failed to disclose matters which would have vitiated any probable cause to the United States Commissioner who signed the search warrant. An extensive hearing was held on this motion. The affidavit is set forth in Appendix A of this memorandum and order.

The basis on which the search warrant was sought and issued by the United States Commissioner was the affidavit of Carl E. Stone, an investigator for the Alcohol and Tobacco Tax Division of the Treasury Department, that at the premises known as 2801 Broadway there were concealed certain ammunition and firearms which had been unlawfully shipped or received in interstate commerce in violation of 15 U.S.C. § 902(e) and (f).

The elements of the crime alleged to have been committed are (1) shipment (or receipt from a shipment) in interstate commerce, (2) of firearms as defined by 15 U.S.C. § 901(3) or of ammunition as defined by 15 U.S.C. § 901(7), and (3) by a person who has

been convicted of a crime punishable by imprisonment for a term exceeding one year, or who is under indictment or who is a fugitive from justice.

There is no dispute over the statement in the affidavit which sets forth William E. Thoresen's conviction of a crime punishable by imprisonment for a term exceeding one year. However, it is argued that the affidavit fails to set forth sufficient facts to be a basis for probable cause to believe that arms or ammunition of the type covered by the statute were shipped, or that they were shipped in interstate commerce—the remaining two required elements of the crime under which the search warrant was issued.

■ This Court holds that the affidavit was sufficient to withstand the above attack. The affidavit in so many words sets forth the following facts: 1, that the affiant had seen copies of records of a firearms dealer in West Hurley, New York which indicate that William E. Thoresen, III, 2801 Broadway, San Francisco purchased firearms parts on or about March 10, 1967; 2, that from information received from other government agents the affiant was informed that (a) William E. Thoresen, III was observed at the Heart of Charlotte Motel, Charlotte, North Carolina during the period of April 1, 1967 to April 4, 1967, (b) that firearms were placed in the motel room occupied by Mr. Thoresen, and (c) that on April 3, 1967 William E. Thoresen, III ordered and caused to be made by a lumber yard three heavy wooden boxes with handles; 3, that the affiant observed what appeared to be the same boxes in the offices of the Railway Express Agency in San Francisco, California; 4, that the affiant was informed from the records of the Railway Express Agency that on April 4, 1967 from North Charlotte, North Carolina there was shipped 27 metal cans of cartridges and 2 "ch" cartridges of an approximate weight of 846 pounds consigned to William E. Thoresen, 2801 Broadway, San Francisco; 5, that the affiant observed on April 18,

1967 at the Railway Express Agency, 1815 Egbert Street, San Francisco, approximately 58 Containers consigned to W. E. Thoresen, 2801 Broadway, San Francisco, one of which containers was marked "1200 cartridges, cal .38 special, ball M41 in cartons" and another of which was marked, "1000 cal .45 cartridges, ball M1911 cartons"; 6, that the affiant observed on April 3, 1967 at the Railway Express Agency, 1851 Egbert Street, San Francisco a partially opened cardboard container consigned to W. E. Thoresen, 2801 Broadway, San Francisco, which contained three rifled firearms barrels; 7, that the affiant observed on April 20, 1967 the delivery by the Railway Express Agency to 2801 Broadway, San Francisco of the 58 containers previously observed, including the boxes labeled ammunition and the cardboard box containing the firearms barrels, the receipt for delivery of these articles and the placing of them inside the premises at 2801 Broadway.

In summary, the affidavit sets forth that William E. Thoresen on March 10 purchased firearms parts in West Hurley, New York. On April 4, 846 pounds of cartridges were shipped from North Carolina to William E. Thoresen, 2801 Broadway, San Francisco. In early April he occupied a motel in North Carolina in which there were firearms. Also while in North Carolina he ordered three heavy wooden boxes. By April 18 in San Francisco at the office of the Railway Express Agency, an interstate carrier, there had arrived (a) several boxes similar to those ordered in North Carolina, (b) a large number of boxes, two of which were labeled as containing that kind of ammunition covered by 15 U.S.C. § 901(7), and (c) some rifled barrels which appeared to be firearm parts as defined by § 901(3). The ammunition in (b) and the rifled barrels in (c) were consigned to William E. Thoresen III at 2801 Broadway, and were eventually delivered to that address.

Mr. Thoresen argues that there is no basis for inferring probable cause from this information: first, there is no par-

ticular source for the information received regarding Mr. Thoresen at Charlotte, North Carolina, other than "other government agents", and thus that information is too unreliable to be the basis of any inference, and second, even assuming that much of the information can be considered sufficiently reliable, all the information together is insufficient to be the basis for any inference that Mr. Thoresen had shipped firearms or ammunition, or that he shipped such articles in interstate commerce.

It is the opinion of this Court that the affidavit survives both aspects of this attack. This Court relies chiefly on United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), and the discussion in it quoted below:

"While a warrant may issue only upon a finding of 'probable cause,' this Court has long held that 'the term "probable cause" * * * means less than evidence which would justify condemnation,' Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364, and that a finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial. Draper v. United States, 358 U.S. 307, 311, 79 S.Ct. 329, 3 L.Ed.2d 327. As the Court stated in Brinegar v. United States, 338 U.S. 160, 173, 69 S.Ct. 1302, 93 L.Ed. 1879, 'There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.' Thus hearsay may be the basis for issuance of the warrant 'so long as there * * * [is] a substantial basis for crediting the hearsay.' Jones v. United States, supra, 362 U.S. 257 at 272, 80 S.Ct. 725, 4 L.Ed.2d 697. And, in *Aguilar* we recognized that 'an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant,' so long as the magistrate is 'informed of some of the underlying circumstances' supporting the affiant's

conclusions and his belief that any informant involved 'whose identity need not be disclosed * * * was "credible" or his information "reliable" '. Aguilar v. State of Texas, supra, 378 U.S. 108 at 114, 84 S.Ct. 1509, 12 L.Ed. 2d 723.

"These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

"This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. See Aguilar v. State of Texas, supra. Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the

existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. Jones v. United States, supra, 362 U.S. 270, 80 S.Ct. 725." United States v. Ventresca, supra, 380 U.S. at 107–109, 85 S.Ct. at 745–746.

 The holding in *Ventresca*, supra, permits the affiant to rely on certain hearsay information, and this Court feels that the type of hearsay relied upon in the present affidavit did not exceed the bounds permitted. Furthermore, a major portion of the information set forth in the affidavit came from the affiant's own observations.

The attack on the force of the inferences to be drawn from the information presented in the affidavit is as follows: There is no relevant inference to be drawn from the ordering of the boxes in North Carolina because there is nothing in the affidavit to indicate what the boxes were to be used for. Furthermore, no relevant inference can be drawn from the existence of boxes labeled "ammunition" and consigned to William E. Thoresen at the San Francisco Railway Express Agency because there was nothing in the affidavit to show that the boxes actually contained what was described on the label. Even assuming the labels to be accurate, with regard to the boxes whose labels did not describe the exact type of ammunition, there was nothing to show that the ammunition was the kind covered by 15 U.S.C. § 901(7), since that section excludes all rifle, shotgun, and .22 caliber rimfire ammunition. The mere presence at the San Francisco Railway Express Agency of packages consigned to William E. Thoresen cannot be the basis for an inference that the packages were shipped interstate.

The argument continues: with regard to the ammunition that was shown to have traveled interstate there was nothing to show that it was the kind that is covered by § 901(7). With regard to the § 901(7) ammunition and the rifled barrels there is nothing to show that they traveled interstate. With regard to all the boxes labeled "ammunition" there is nothing to prove they contained ammunition. With regard to the unlabeled box theoretically constructed in North Carolina, and shipped from there to California, there is nothing to indicate what it contained. Finally, with regard to the firearms seen in the motel room in North Carolina there is nothing to indicate that they were ever shipped anywhere.

The core of this argument is the theory that the inferences to be drawn from the whole of an affidavit can not be greater than the sum of the individual inferences to be drawn from the segmented parts of the affidavit. In the opinion of this Court such a theory is false. While the analysis of each part of the affidavit may serve to focus on the limitations of the inferences which can be drawn, when the parts of the affidavit are observed as a whole, a pattern of activity shows forth. In this case one aspect of that pattern of activity is interstate shipment of firearms and ammunition. To argue that a large number of trees standing in one area at the same time does not suggest the existence of a forest is to view the affidavit in the hypertechnical and fictional fashion disapproved by the United States Supreme Court in *Ventresca*. The gross volume of the firearms and ammunitions indicated by the affidavit to have been shipped in interstate commerce is, in itself, an element upon which probable cause could be based.

Thoresen also argues that Mr. Stone, the affiant, in effect, made material misrepresentations to the United States Commissioner in the affidavit by failing to disclose certain information which would have vitiated the importance of many of the facts stated in the affidavit and as a subsection of this point, that Mr. Stone failed to make certain obvious and easy investigations that would have disclosed information that would have vitiated the statements set forth in the affidavit.

At the hearing on this motion it was brought out that Mr. Stone's only description of the boxes which were ordered in North Carolina was that they were heavy and wooden and had handles. Thus it is argued that it was misleading to use the term "by description" in the paragraph which describes Stone's finding similar boxes at the Railway Express Agency in San Francisco, since heavy wood boxes with handles is such a broad description that it is meaningless. While different words might have been used by Mr. Stone to describe how he recognized the boxes, the words used are not, in the view of this Court, a material misrepresentation.

 Defendant complains of a portion of Stone's affidavit which reports on information from the Heart of Charlotte Motel and which was based on "information received from other government agents." At the hearings it was shown that the background of this statement was a memorandum from Special Agent Donald E. Larsen of the F.B.I., which, in turn, was based on a memorandum from the F.B.I. Agent in Charlotte, who had interviewed the motel manager, who had talked to the personnel of the motel. According to defendant, Stone should have verified the source of his information, otherwise it was too speculative and uncertain to be the basis for probable cause. There are at least two weaknesses in this contention. First, it is a hindsight argument which is really not relevant to the problem which confronted Stone at the time of the preparation of the affidavit. As a matter of fact Stone had no knowledge as to how or from whom Agent Larsen received his information. The reputation and integrity of the F.B.I. as a competent law enforcement agency of the United States supplies the requirement of reliability as to the information disclosed in the F.B.I. memorandum. Stone was entitled to rely upon this. If defendant's theory is carried to its logical conclusion, then all police activity which relies upon information made available by other law enforcement agencies would have to stop until the information supplied was verified by the user. This is just what the Supreme Court struck down in *Ventresca*, supra, where the government agent making the affidavit for a search warrant was permitted to rely upon hearsay information given by other government agents as a basis for stating probable cause. Second, there was no evidence that the information was lacking in reliability so as not to be the basis for probable cause. Here, the government agents were seeking information from a business organization and the people in it were not being used as tools to make a criminal case. The facts were reported through the chain of organization which is perfectly logical and reasonable as a preliminary step, and a perfectly proper basis for determining the reasonable probabilities of the situation.

 Thoresen also objects to the failure of Mr. Stone to inquire into the points of origin of the shipments which he said he observed at the Railway Express Agency by looking at the shipping tags (which might have revealed only intrastate shipment), and the failure to investigate which of the two Thoresens was engaged in the various activities of shipping, ordering construction of the wooden boxes, and receiving the other boxes under investigations since only Mr. Thoresen was subject to the disability of a conviction punishable by imprisonment for a term exceeding one year. This Court must decide the merits of the affidavit for the search warrant without attempting to judge the merits of the detective work by the investigative agencies involved. It is sufficient that nothing in the evidence indicated that the work was so sloppy and inaccurate as to suggest that the agency was proceeding against Mr. Thoresen in bad faith, or that Mr. Stone was wilfully keeping back information from the United States Commissioner.

On April 21, 1967 when Mr. Stone proceeded to execute the search warrant for 2801 Broadway, he found that some

eleven packages had just been taken from the house and loaded into a Mayflower Moving and Storage van. This van was parked in the street in front of the residence at 2801 Broadway, and the driver and his helper were in the process of taking boxes from the house and loading them into the van. These boxes appeared to be part of the same group of boxes which had been delivered by the Railway Express Agency the day before, and which included the boxes labeled as containing ammunition and the one containing the rifled barrels. Without knowing the contents of the boxes already in the van, and without obtaining any further search warrants, Mr. Stone ordered the driver and helper of the van to unload the boxes and put them back into the house where Mr. Stone took custody of them.

Thoresen argues that the search warrant for 2801 Broadway does not permit Mr. Stone to seize items already loaded into the van belonging to a common carrier, when there is little reason to fear the disappearance of the boxes and plenty of time to obtain a search warrant for the van.

What Thoresen would require the agents to do, namely, to return to the United States Commissioner for a search warrant of the truck, strikes this Court as needlessly ritualistic. While technically the search warrant in Mr. Stone's hands covered only the house at 2801 Broadway, it is clear that the boxes on the truck had just been taken from the house subject to the search warrant and were a part of the objects described in the search warrant. The invasion of Thoresen's privacy in his own home was permitted by the search warrant obtained by Mr. Stone. The seizure of the boxes from the van did not constitute a significantly different invasion under the circumstances.

The affidavit for the search warrant, when read from its four corners, states probable cause for the issuance of the warrant.

In addition to the attack on the search warrant defendant raises several other issues on his motion to suppress. These issues raise questions of fact which must be decided to determine the issues. The issues concern several aspects of the investigation made by the Alcohol and Tobacco Tax Division of the Treasury Department into the possession and transportation of firearms and ammunition by defendant, William E. Thoresen, III. Stone, the government's chief investigator, commenced his assignment in the case on March 16, 1967. From that time until the service of the search warrant at the Thoresen residence at 2801 Broadway in San Francisco on April 21, 1967, and continuing throughout the service of several later search warrants and the conducting of numerous other investigations which continued through May of 1967, there was great activity by the Alcohol and Tobacco Tax Division, the investigating agency for the government. There were eleven A.T.U. agents assigned to the case, and various other governmental investigating and law enforcement agencies, both federal and state, were called upon for assistance. Among these were the Federal Bureau of Investigation (F.B.I.), the California Bureau of Criminal Identification and Investigation of the Department of Justice of the State of California (C.I.I.), and agencies of the States of Maine and New York.

Outside of the attack on the validity of the search warrant issued on April 21, 1967, defendant makes claims of illegal search and seizure to evidence which he alleges is related to the weapons identified in certain Counts of the Indictment. These claims arise out of certain incidents about which evidence was taken on the motion to suppress. The evidence was voluminous, often highly conflicting, and requires extensive findings of fact to resolve the evidentiary problems. After the facts have been found conclusions of law will be made thereon based on a discussion of the principles of law applicable to the case. The incidents have been identified by the parties in accord-

ance with the name of the owner or operator of the place where the incident occurred. They will be referred to here in the same manner and in the following order: (1) Railway Express Agency, San Francisco; (2) Western Gillette Truck Lines, Oakland; (3) Coast Drayage Co., Berkeley; (4) Ringsby Truck Lines Co., Oakland; and (5) the garage at 2990 Jackson Street, San Francisco.

1. *Railway Express Agency*

This incident refers to a series of events which occurred at the San Francisco office of the Railway Express Agency at 1815 Egbert Street (R.E.A.) where freight is received and delivered. In the event the freight cannot be delivered it is held pending delivery. The action in this incident begins with an examination by A.T.U. Agent Stone of a partially opened cardboard carton containing 3 rifled firearms barrels in one of the R.E.A. Baggage rooms, probably the On-hand Department, on April 3, 1967. He photographed the carton at the R.E.A. baggage room on April 4, 1967. The carton is in evidence as plaintiff's Exhibit 2, and the photographs as defendant's Exhibits B.15 and 16. Stone testified that when he saw the carton it was open and its contents observable as the photographs disclose. He stated further that neither he nor any other government agent opened the carton or requested any employee of R.E.A. or any one else to open the carton. Witnesses Frisch and Merel, clerks in the On-hand Department of R.E.A., testified that the carton was partially open, and Merel stated that it became so much open that he could see its contents, that its condition as it appeared in the photographs was observed by him, and that he retied and resealed the carton later on before delivery. The Court finds the testimony of Stone with respect to the cardboard carton to be credible, and finds further that the carton became opened by circumstances of handling not contributed to or participated in by government agents, and that the contents of the carton were visible to any person who was there to observe them.

The other item of evidence which was shipped through R.E.A. and which has been challenged in the motion to suppress is a wooden box and its contents. The box, including its lid, is in evidence as defendant's Exhibit B.29, and there are three photographs in evidence, defendant's Exhibits B.19, B.20, and B.21. The photographs were taken May 1, 1967, after the box had been seized pursuant to a search warrant, and after Mrs. Thoresen had been arrested by Agents Quinn and Graney of A.T.U. on that day outside R.E.A. after she had picked up some freight. The photographs do not purport to be a pictorial representation of the condition of the box when Agent Quinn says he saw it and its contents in the R.E.A. with the lid off at an earlier date. The photographs do, however, accurately portray the approximate size and make-up of the box, together with some of the addresses written on the box. The challenged examination was made at the R.E.A. on April 27, 1967, by Agent Quinn, who was assigned to make the examination by Stone after a telephone call from Mortenson, the Administrative Supervisor at R.E.A. There appears to be a sharp conflict between the testimony of Quinn and Mortenson as to how far the box was open when Quinn examined it. Quinn testified that when he saw the box at the R.E.A. the top was off, or nearly off, so that the contents of the box could be observed by visual observation, and that he had observed a German sub-machine gun (M-P.40) in the box. He reported this to Agent Stone who used the information in an affidavit for a search warrant presented to Judge Wollenberg on April 28, 1967. The search warrant and the affidavit are in evidence as defendant's Exhibit B.28. The affidavit states,—" * * * and that the fourth carton bearing R.E.A. receipt No. 592929 shipped by W. E. Thoresen from 4502 Devine Street, Columbia, South Carolina, had been opened by the Express Company and the Investigator (Quinn) observed a sub-machine gun therein." Quinn's testimony on who told him the box had

been opened by Express Company personnel does not disclose the name of the person opening the box, or the name of the person who told him how and why the box was opened. In this respect Quinn's testimony is not as clear, positive and direct as the Court desired, but on the whole the Court finds Quinn to be a credible witness, and the Court finds his testimony to be true and correct. In this respect his testimony is consistent with the plan and pattern of the various government investigations concerning the numerous Thoresen shipments. The extensive transcript does not disclose a single request by any agent of the government to any common carrier shipper to break or open any package being handled by the shipper, or any testimony of any carrier witness that any government agent suggested that any package be opened, in or out of the presence of the government agent. What the transcript does disclose is that the government agents did request the common carrier shipping companies to notify the government when shipping information concerning the Thoresens arrived in the San Francisco Bay Area, and that the government agents did inspect the packages and shipping documents when the packages arrived without breaking or opening the package, or requesting the carrier to do so.

Mortenson's testimony shows that on April 27th the box in question was in the On-hand Department at the R.E.A. Before Quinn, the government agent, arrived he saw the box in a partially opened condition, that is, the lid was opened on one side about 3½ to 4 inches. He did not look in the box and does not think the contents of the box could be seen with the box open to that extent. He is the only R.E.A. witness who ever saw the box open. Cunningham, the R.E.A. Clerk in Columbia, South Carolina, received the box for shipment, and said that he banded the box four ways, that is with two metal bands the long way of the box, and two metal bands the short way of the box. In this respect Cunningham was in error

to some extent because physical examination of the box, defendant's Exhibit B.29, does disclose evidence of banding the short way, but not the long way. An examination of the photograph, Exhibit B.19, shows shadows and impressions of the bands. The Court finds that the box was banded two times the short way around, but not lengthwise. It is obvious that the bands that were applied by Cunningham had to be removed, either by cutting or breaking, before the box could be opened in the manner described by Quinn, or Mortenson. The other R.E.A. employees in San Francisco, who were called as witnesses, Frisch, Merel, Noll and Ward, never saw the box open, or never remembered seeing the box. Ward took the box from the On-hand Department to Mrs. Thoresen's car on May 1st, the day of her arrest, and the day the box was opened under the authority of a search warrant. At that time Ward says the lid was on the box tightly and the box was closed when he picked it up. There is no testimony from any R.E.A. employee that any one ever closed the box, that is, nailed the lid back into place. Defendant argues that the Court must find that Quinn perjured himself, and infer that he opened the already partially opened box, examined its contents, closed the box and left the premises without being observed. This the Court cannot do in the light of the direct testimony of Quinn that he did not open the box, and the testimony of the R.E.A. witnesses. The Court observed Quinn as a witness, and he appeared to be truthful in all material respects. He was not evasive or equivocal, nor was his testimony so inherently improbable as to be unbelievable. The contrary inference that Quinn opened the box after being taken to the box by Mortenson and then, after observing its contents, closed the box so that no one would know it had been opened is much more incredulous. It took some tools to open and close the box, some sort of a prying tool to open it, and some sort of a hammering tool to close it. The box is made of substan-

tial plywood and the lid was nailed on with substantial nails. The R.E.A. witnesses testified that there was some R.E.A. employee in the On-hand Department at all times, either Frisch, Merel or Noll. Mortenson said he took Quinn to the box, but thinks he left Quinn there, but he also thought that one of the R.E.A. men was in the area. Under these circumstances, the fact that no one saw Quinn attempting to open or close the box is a strong factor corroborating Quinn's testimony. The Court finds that Quinn did not open the box on April 27th.

### 2. *Western Gillette Truck Lines*

On April 28, 1967, Western Gillette Truck Lines delivered from its storage space in Oakland upon the direction of Stone of A.T.U. 2,500 pounds of small arms ammunition to Ft. Cronkhite, a military installation of the United States. The ammunition was a shipment from Tucson, Arizona, to Oakland, California, to W. E. Thoresen over the lines of Western Gillette Truck Lines, a common carrier by truck. The Shipment had arrived in Oakland in late March, or early April, and was being held by the carrier for delivery. After the newspaper publicity concerning the service of the search warrant at 2801 Broadway in San Francisco, Mr. Wayne W. Manning, manager of Western Gillette in Oakland, became aware of the shipment. After April 21st he was interviewed by agents of A.T.U., who asked to see the shipment. He showed the agents the cartons and crates in which the shipment came, but nothing was opened, and no package was broken. When Manning became aware of the quantity of ammunition he had stored in the shipment (2,500 pounds) he knew he was in violation of the ordinances of the City of Oakland with respect to handling explosives. He discussed the matter with his superior in Los Angeles and also with a Lt. Anderson of the Fire Marshal's office of the City of Oakland. He knew he had to move the shipment to a place where such a class of explosives could be stored safely. Agent Stone also knew that the ammunition had to be moved so he made arrangements at an appropriate military installation to store it. Stone told Manning to deliver the ammunition to Ft. Cronkhite, which Manning did by Western Gillette truck. The Court finds that Manning acting for Western Gillette was required to immediately remove the quantity of ammunition in the Thoresen shipment from the Oakland terminal of Western Gillette because of safety regulations of the City of Oakland and not because of any order, threat or direction of the United States, or any agent thereof. The Court further finds that Manning accepted Ft. Cronkhite as a safe place to store the ammunition although Ft. Cronkhite was selected by Agent Stone as the place to store the ammunition.

### 3. *Coast Drayage Company*

In the middle of March, 1967, government agents came to the terminal of the Coast Drayage Company, a common carrier, in Berkeley, California, and asked to examine a shipment to W. E. Thoresen or Mr. W. E. Thoresen. Robert Atherton, manager of the Berkeley terminal, opened the warehouse where the shipment was stored under lock and key pending delivery and permitted the agents to visually examine under his supervision the cartons and packages of the shipment, read the addresses and shipping directions, and take photographs of the packages. No packages were opened or broken. The agents were told that Mrs. Thoresen had made the arrangements for storage and that Atherton had never seen Mr. Thoresen. On April 25th or 26th the agents seized the shipment pursuant to a search warrant, defendant's Exhibit B.27. The Court finds Atherton's testimony to be credible, true and correct.

### 4. *Ringsby Truck Lines*

On March 26, 1967, Ringsby Truck Lines of Oakland, California, a common carrier, received a shipment of freight consigned to W. E. Thoresen, 2801 Broadway St., San Francisco, California. According to Robert L. Holder, a longtime employee (nineteeen years) of Ringsby, this shipment was received and stored in Oakland. Sometime in April three

A.T.U. agents, Stone, Quinn and Graney, came to the terminal and, after identifying themselves, asked to examine the shipment and shipping documents. He permitted them to make an examination of the cartons and packages, but not to open or break any carton or package. In this respect the testimony is not precise, but the Court finds that Holder meant that examination was made of the whole package without breaking or opening any package. Mr. Holder's negotiations were with Mrs. Thoresen, but the shipment was consigned to Mr. W. E. Thoresen. On April 25, 1967, the shipment was seized by government agents at the Ringsby terminal in Oakland pursuant to a search warrant, defendant's Exhibit B.26. The Court finds Mr. Holder's testimony to be credible, true and correct.

5. *The Garage at 2990 Jackson Street*

This incident arises out of the seizure without a search warrant by the government of a Haarens Vaabbernarsenal 37 millimeter, rubber tired cannon at 2990 Jackson Street. According to Agent Stone, at the time of the service of the search warrant and the arrest at 2801 Broadway, he discovered the Thoresens had rented garage space at 2990 Jackson Street. This space was part of a two stall garage. A tenant, also manager, of the apartment house in which the garage stalls were located occupied the other stall with his car. Mrs. Thoresen made the arrangements for the lease of the space which, according to the owner of the building, Mr. Pilgrim, was for a boat trailer on a month to month basis. The garage space had two stalls with one common door to be used by both tenants. The other tenant, Mr. Constable, was elderly and at the time of the hearing he was suffering from a stroke and was unable to testify. At the time of the incident Stone was advised by Constable that the cannon was in the garage, and that the space had been rented to the Thoresens. Stone went to the garage with Constable and was admitted into the garage by Constable to view the cannon. The cannon had attached to it evidence that it had been shipped in interstate commerce by Thoresen. Constable asked to have the cannon removed from the premises as soon as possible. Pilgrim testified he gave Ladar, Assistant United States Attorney, a key on April 22nd for the purpose of removing the cannon. Later the cannon was removed without a search warrant by an Army truck to the Presidio at San Francisco in the custody of the United States. A stipulation was entered into between counsel that Ladar received the key from Pilgrim or Constable, and opened the garage door for the Army truck. The Court finds the testimony of Stone and Pilgrim in this respect to be credible, true and correct.

*Conclusions of Law*

■■■■ I. In finding that government agents did not open the wooden box, Exhibit B.29, or persuade agents of the Railway Express Agency to open it, this Court has relied on the rule that a defendant who seeks to suppress evidence because of the violation of some Fourth Amendment right has the burden to carry on all material issues. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); and Addison v. United States, 317 F.2d 808, 812 (5th Cir. 1963) cert. den. 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605, pet. for stay den. 376 U.S. 936, 84 S.Ct. 791, 11 L.Ed.2d 657, reh. den. 376 U.S. 966, 84 S.Ct. 1121, 11 L.Ed.2d 984 (1964). While the burden must be placed on the government if they seek to fall under the exception to the general requirements of a search warrant through a consent search or under the special circumstances doctrine, United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951) and McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948), defendant's proof did not reach the point where this rule would apply. Defendant failed to prove that the government engaged in activity for which a search warrant is required.

■■■■ II. The inspection by federal agents of the outside of a box and its

labeling while the box is in the custody of a common carrier does not violate the Fourth Amendment, constitutional rights of the shipper of that box. The inspection by a federal agent of the contents of a box which has been previously opened by an unknown person for an unknown reason while that box is in the custody of a common carrier does not violate the Fourth Amendment, constitutional rights of the shipper of that box.

Defendant on his motion to suppress attempted to prove facts that would bring him within the holding of Corngold v. United States, 367 F.2d 1 (9th Cir. 1966). That case held that where the government agent either participates in the search which is ostensibly made by the common carrier, or where he induces the common carrier to make the search, that search will be deemed to have been by the government. The *Corngold* case, supra, also holds that the shipper does not sacrifice his Fourth Amendment rights to privacy with regard to the inside of the box when he surrenders the box to a common carrier for shipment. As stated above the defendant in this case has failed to establish that a government agent opened, induced the opening of, or participated in the opening of either the cardboard box or the wooden box. Thus the defendant has failed to bring himself within the protection of the *Corngold* holding.

Defendant also argues that the viewing of the already opened boxes and the viewing of the labels and addresses of the boxes at the different warehouses breaches his right to privacy under the Fourth Amendment. This Court does not interpret the *Corngold* case to have carried the right of privacy this far.

In Gold v. United States, 378 F.2d 588 (9th Cir. 1967) an airline employee, in an action held by the court not to be a federal search, broke into a package and found some pornographic film. He called government agents. The agents came to the airline terminal, viewed some of the film, and later obtained a search warrant and seized the film. There is in Gold v. United States, supra, an implicit holding that the viewing of the film without a search warrant on the premises of the airlines did not violate the Fourth Amendment right of privacy of the shipper. It is implicit in the *Corngold* case that the use of a scintillator to test a box for radiation on the premises of the common carrier does not invade the shipper's right of privacy, though the case does not expressly cover that issue. The viewing of the open boxes or the labels of the boxes in this case would seem to be indistinguishable.

■ Second, a doctrine of law holds that agents of the government once legally on certain premises need not blind their eyes to objects in plain sight. Ker v. State of California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Gilbert v. United States, 366 F.2d 923, 932 (9th Cir. 1966) cert. den. 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967); Davis v. United States, 327 F.2d 301, 305–306 (9th Cir. 1964). By analogy the viewing by the agents of the labels on the boxes or the viewing of the contents of the already opened boxes in this case would be proper if their entry onto the premises of the various common carriers did not violate any Fourth Amendment rights of the defendant.

■ Research has not yielded any cases directly on the subject of whether the mere entry of government agents onto the premises of a common carrier transgresses the rights of a shipper whose package is on these premises and is viewed by the agents. However, nothing has been found which would indicate that a shipper's rights to privacy are so extensive. A contrary analogy can be drawn from the rule which permits an agent in search of evidence to enter into the entranceways or hallways of a multitenant apartment house without being held to have invaded the privacy protected by the Fourth Amendment of a tenant of one of the individual apartments of that building. Corngold v. United States, 367 F.2d 1, 3 (9th Cir. 1966); United States v. Miguel, 340 F.2d 812, 814 (2d Cir. 1965) cert. den. 382

U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97, reh. den. 382 U.S. 922, 86 S.Ct. 296, 15 L.Ed.2d 238 (1965).

Third, a person must be deemed to have waived his right to privacy as to the outside of a box and its labeling or the inside of a box opened by a private person when he contracts to ship such a package through a common carrier. A common carrier operates under a state or federal certificate of public convenience and necessity. It is to that extent a public enterprise, and when a person makes use of such a carrier, he submits to public inspection of the outside of the package, apart from any tariff regulations for inspection by the carrier itself.

III. Where joint lessees of a two car garage with one entrance are presently using that garage jointly, either lessee has the power to consent to a search of that garage by government agents.

Thus Mr. Constable had the power to consent to a search by government agents of the garage at 2990 Jackson since he was a joint lessee of that garage with Mrs. Thoresen. Burge v. United States, 342 F.2d 408, 413 (9th Cir. 1965) cert. den. 382 U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1965); Nelson v. People of State of California, 346 F.2d 73, 77 (9th Cir. 1965) cert. den. 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965); United States v. Botsch, 364 F.2d 542, 546 and 547 (2d Cir. 1966), cert. den. 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810, reh. den. 368 U.S. 987, 87 S.Ct. 1290, 18 L.Ed.2d 242 (1967).

If Mr. Constable had the power to consent to the search on April 21, the action of Mr. Pilgrim in granting entry to the garage on April 22 so that the agents could carry away the cannon was merely confirmatory of the action of Mr. Constable and this Court does not need to decide whether Mr. Pilgrim could have permitted the original search.

After seeing the cannon with the evidence on it that it had been shipped in interstate commerce, the agents knew it was a firearm as defined in 15 U.S.C. § 901(3), they knew it had been shipped in interstate commerce by Mr. Thoresen, and they knew that Mr. Thoresen had been convicted of a crime punishable by imprisonment for a term exceeding one year. Thus they had probable cause to believe that the cannon had been shipped in interestate commerce in violation of 15 U.S.C. § 902(e). Based on this the cannon was subject to seizure and forfeiture under 15 U.S.C. § 905(b), and the provisions of 26 U.S.C. § 7301 et seq.

The fact that the agents waited until the following morning to seize the cannon, and did so without a warrant, does not mean that Mr. Thoresen's rights of privacy were violated. The agents properly learned that the cannon was in the garage and that it was contraband. At this point it was subject to immediate seizure. United States v. Deane Hill Country Club, Inc., 342 F.2d 794 (6th Cir. 1965) cert. den. 381 U.S. 937, 85 S.Ct. 1769, 14 L.Ed.2d 701 (1965).

Accordingly, it is ordered that defendant's motion to suppress evidence be, and the same is hereby denied.

*Appendix A*

*Affidavit for Search Warrant at 2801 Broadway, San Francisco, California*

Before RICHARD S. GOLDSMITH, San Francisco, California

The undersigned being duly sworn deposes and says:

That he has reason to believe that on the premises known as 2801 Broadway Street, San Francisco, California, consisting of a two story wood frame building located on the southwest corner of Broadway and Broderick Streets, San Francisco, San Francisco County, California, in the Northern District of California there is now being concealed cer-

tain property, namely 1200 Cartridges, caliber .38 Special, ball M-41, in cartons; 1000 Caliber .45 cartridges, ball M-1911, in cartons, suitable as pistol and revolver ammunition and firearms and parts thereof as defined in Section 901, United States Code Title 15, Chapter 18, which have been unlawfully shipped or received in interstate commerce in violation of Sections 902(e) and 902(f), Title 15, Chapter 18, United States Code, which have been used as the means of committing a criminal offense.

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: I have been an Investigator in the Alcohol and Tobacco Tax Division for eleven years. On April 19, 1967 I learned that the records of the City of San Francisco, California, Building Permits Section reflect a permit issued for the removal of non-bearing basement walls of the premises located at 2801 Broadway, San Francisco, California owned by William E. Thoresen. I am in possession of certified, exemplified copies of the conviction record of William E. Thoresen, III for the crime of larceny, committed at Bar Harbor, Hancock County, State of Maine on September 7, 1959. This crime being punishable by imprisonment for a period of more than one year. On April 3, 1967 at Railway Express Agency, 1815 Egbert Street, San Francisco, California, I observed a partially opened cardboard container consigned to W. E. Thoresen, 2801 Broadway, San Francisco, California. This package contained three rifled firearms barrels. On April 18, 1967 at Railway Express Agency, 1815 Egbert Street, San Francisco, California I observed approximately 58 containers containers consigned to W. E. Thoresen, 2801 Broadway, San Francisco, California. Two of these packages were marked as follows: 1200 cartridges, cal. .38 special, ball M-41 in cartons; and the other package marked 1000 cal. .45 cartridges, ball M1911 cartons. On April 20, 1967 I observed a railway express truck deliver the 58 containers described above to 2801 Broadway Street, San Francisco, California. Among those containers were the packages containing the firearms parts and ammunition mentioned above. I observed the delivery described above receipted for and the articles moved inside the premises at 2801 Broadway Street, San Francisco, that between the time the time of this delivery, which was approximately between 12:20 and 1:40 p. m. on April 20, 1967, and the time of presenting this affidavit to the United States Commissioner at approximately ———— on April 21, 1967, I am informed by agents of the Alcohol and Tobacco Tax Division who have had the premises under observation that no activity disclosing removal of this delivery has occurred; I have examined copies of records of a firearms dealer in West Hurley, New York and have copies of a purchase of firearms parts on or about March 10, 1967, the records showing that the firearms parts were sold to William E. Thoresen, III, 2801 Broadway Street, San Francisco, that from the records of the company I am informed that the purchase consisted of firearm parts; and I am informed from records of the Railway Express Agency that on April 4, 1967 from North Charlotte, North Carolina, there was shipped 27 metal cans of cartridges and 2 "ch" cartridges of an approximate weight of 846 pounds consigned William E. Thoresen, 2801 Broadway Street, San Francisco, California, the shipper being shown as William E. Thoresen, 2801 Broadway Street, San Francisco, California; from information received from other government agents I am informed that William E. Thoresen, III, was observed at the Heart of Charlotte Motel, Charlotte, North Carolina during the period of April 1, 1967 to April 4, 1967, and that firearms were placed in the motel room occupied by William E. Thoresen, III; that on April 3, 1967 William E. Thoresen, III, ordered and caused to be made by a lumber yard three heavy wooden boxes with handles, which by description appear to be the same wooden boxes that I have observed in the custody of the

Railway Express Agency in San Francisco, California.

CARL E. STONE /S/
Carl E. Stone (Affiant)
Investigator, Alcohol and
Tobacco Tax Division

Sworn to before me, and subscribed in my presence, April 21, 1967.

RICHARD S. GOLDSMITH /S/ (SEAL)
Richard S. Goldsmith
United States Commissioner