**UNITED STATES of America,
Appellee,**

v.

**Joseph Rodney THOMAS, Appellant.**

No. 25328.

United States Court of Appeals,
Ninth Circuit.

Sept. 25, 1970.

Certiorari Denied Jan. 25, 1971.
See 91 S.Ct. 587.

William C. Miller, Los Angeles, Cal., for appellant.

Robert L. Meyer, U. S. Atty., H. J. Novak, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before HAMLEY and DUNIWAY, Circuit Judges, and THOMPSON,* District Judge.

HAMLEY, Circuit Judge:

Joseph Rodney Thomas appeals from his conviction on three counts of violation of 21 U.S.C. § 174 and one count of violation of 26 U.S.C. § 4705(a). The Government concedes that there is no evidence supporting the conviction under section 4705(a). We agree and reverse as to that count.

On the remaining counts, defendant's only point is that the conviction was based upon evidence seized as the result of an unreasonable search of his person. The search was made without either a warrant for the search of his person, or a warrant for his arrest. The Government defends the search on the ground that it was incident to an arrest made on probable cause to believe defendant had committed a felony. We agree, and affirm as to the three section 174 counts.

There was substantial evidence tending to establish the following facts: On April 23, 1969, Agent Charles Henry of the Federal Bureau of Narcotics and Dangerous Drugs, operating under cover, entered the apartment of a suspect, John McCallon. Henry entered the apartment, located at 1121 West Vernon Avenue, Los Angeles, with Government advance funds, for the purpose of providing McCallon an opportunity to sell heroin to him.

McCallon agreed to sell an ounce of heroin to Henry, accepted money from the agent and left to get the heroin from his source, leaving Henry at the apartment. McCallon proceeded to a private residence at 1319 West Sixty-Eighth Street, Los Angeles, and entered that house. Twenty minutes later McCallon left the house on West Sixty-

Eighth Street, returned to his apartment and delivered the heroin to Henry, who then left.

On April 24, 1969, agents of the Bureau obtained a warrant to search the West Sixty-Eighth Street residence. Some time prior to the execution of this search warrant, on April 28, 1969, Bureau agents ascertained through the Post Office Department that the house was occupied by defendant Thomas. However, the search warrant named the occupant as "Brooks," which was an alias McCallon used in dealing with Henry.

On April 28, 1969, Agent Henry again went to McCallon's apartment for the same purpose as on his first visit. Again McCallon agreed to make a sale, and Henry gave him currency, the serial numbers of which had been recorded earlier. Once more Henry waited in McCallon's apartment while the latter went to the house on West Sixty-Eighth Street. Shortly after McCallon entered this house, a man came out of the house, got into a car and drove away. A few minutes later this man, who later turned out to be defendant Thomas, returned and entered the house. McCallon then left the house, returned to his apartment, and made a sale of heroin to Henry.

Agents Samuel D. Ozment and Paul D. Herring, who had the West Sixty-Eighth Street home under surveillance at this time, received a radio message from other Bureau agents that the sale to Henry had been completed. They then began approaching the house for the purpose of executing the search warrant. As they approached, Thomas and a female left the house and walked towards Thomas' automobile, parked in front.

Ozment and Herring stopped Thomas and advised him that they had a warrant for the search of the house. Ozment then searched Thomas on the street and found 7.410 grams of heroin

* The Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

on his person, and some of the currency bearing recorded serial numbers. Ozment testified that as soon as he found the heroin he arrested Thomas. The entire party then went into the West Sixty-Eighth Street home and a search was conducted. No additional narcotics were found.

On cross examination, Ozment testified that the reason he arrested Thomas was in part that he had received information to the effect that Agent Henry had purchased narcotics from McCallom at the latter's apartment, after McCallon had entered and left the house from which Thomas had emerged and reentered. Ozment said the arrest was also based on "other information" and observations on his part.

█ Under the described circumstances we think that, prior to his search of Thomas, Ozment had reasonable cause to believe that Thomas was a resident of the house on West Sixty-Eighth Street and that he had engaged in supplying heroin for sale to Henry through McCallon. Ozment therefore had probable cause at that time to arrest Thomas.

█ The fact that Ozment searched Thomas immediately before, rather than immediately after, the formal arrest does not invalidate the search in this case. It is preferable to make the formal announcement of arrest before undertaking a search, thereby precluding any question of whether the fruits of the search were used to justify the arrest. Here, however, the fruits of the search were in no way necessary to establish probable cause for the arrest which immediately followed. The search of Thomas' person was substantially contemporaneous with the arrest, and searches of this kind, if confined to the immediate vicinity of the arrest are permissible. Shipley v. California, 395 U.S. 818, 819–820, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969); United States v. Skinner, 412 F.2d 98, 103 (8th Cir. 1969).

Reversed as to the section 4705(a) count, affirmed as to the three section 174 counts.

DUNIWAY, Circuit Judge (dissenting):

I regret that I am not able to concur in my Brother Hamley's opinion. I do not think that probable cause for the search and arrest (or was it the arrest and search?) of Thomas was proved. The government presented but three witnesses. I analyze the pertinent testimony of each.

1. *Charles Henry.* Henry is a narcotics agent. On April *28*, 1969, he went to an apartment at 1121 West Vernon Avenue, arriving at 11:30 A.M. His purpose was to buy heroin. In the apartment he met McCallon and gave him $325 of official government funds. McCallon left the apartment at 11:55 A. M., but Henry remained there. McCallon returned at about 12:55 P.M. and gave Henry heroin. Henry left the apartment, met other narcotics agents, and told them that he had purchased heroin, the nature of which they verified by a field test. The other agents left the area and joined the surveillance agents who were still "on" McCallon's house and "on" defendant's (Thomas') "now present" residence. They were notified that it was heroin, and an arrest proceeded.

2. *Samuel D. Ozment.* He is also a narcotics agent. On April *20*, (the context makes it clear that this is 28) 1969, he and Agent Herring were in the area of the 1100 block on West Vernon, in surveillance of Agent Henry. They arrived about 11:30 A.M. Henry entered the address at 1121 W. Vernon, Apt. 2, at 11:30 A.M. At about 11:50 A.M. McCallon "exited" Apartment 2 and drove away. Ozment then received a radio communication that McCallon was at 1319 W. 168th (68th) Street. He and Herring went there, arriving at about 12:35 P.M. They took up surveillance about a block from the residence at that address. About 12:40, McCallon "exit-

ed" the location, got into his vehicle and departed. Ozment and Herring stayed there until about 1:15 P.M., at which point they "executed a search warrant." They had been advised that a sale of heroin took place between McCallon and Agent Henry.

Ozment, Agent Herring (not Henry) and Agents Carter and Galia "executed" the warrant. As they approached the location, "Mr. Thomas and a female were exiting the house, approaching the vehicle. They started to get into the vehicle." Ozment told Thomas that they had a search warrant to search the residence and Ozment searched Thomas in front of the house. He found 7.410 grams of heroin in Thomas' shirt pocket and two twenty dollar Federal Reserve notes in his pants pocket. The agents had, from the Post Office Department, a "positive identification" of Thomas as living at 1319 W. 68th St. *Ozment had never seen Thomas before* (italics mine).

The other evidence the searching agents had with respect to a possible transaction involving heroin between McCallon and Thomas was: they received a radio communication from Agent Kennedy "that he had seen Mr. Thomas get into the car he was about to get into then and he had departed right after Mr. McCallon arrived at his house * * * and returned a few minutes later. McCallon then had driven back to the Vernon address and sold Agent Henry the heroin. * * * During the time that Mr. McCallon was at Mr. Thomas' address they saw him get in the car and drive away and then return a short time later, Mr. Thomas. Saw Mr. Thomas

drive away and come back a short time later * * * while Mr. McCallon was still there." Then McCallon left and returned with the heroin to Mr. Henry. Ozment arrested Thomas after the search as soon as he found the heroin.

Ozment identified the search warrant and affidavit which are Exhibit 1 in evidence. The name Brooks in the affidavit was an alias for McCallon. The warrant is for a search of the premises at 1319 West 68th Street; it does not authorize the search of any individual.

3. *Paul D. Herring.* He is a narcotics agent and made the affidavit attached to the search warrant. He was with Agent Ozment on April 28 conducting a surveillance of the West 68th Street residence between 12 and 1 P.M. and when Ozment searched Thomas. In addition to the facts stated in the affidavit for the search warrant he had performed surveillance on April *23*. He saw McCallon leave 1121 West Vernon Avenue, Apartment 2, and tailed him to 1319 West 68th Street. McCallon entered the residence, was there about 20 minutes, and returned to the Vernon Avenue apartment. McCallon re-entered the apartment and Henry came out and produced the heroin and told the agents that he had purchased it from McCallon.[1]

Herring made a check as to the identity of the individuals residing in the residence at 1319 West 68th Street. "We checked with the postal authorities and they had the postman, who is on the route, go by and he, in turn, told us that Mr. Thomas was residing there with his mother." He had no further informa-

---

[1]. Agent Henry testified that on the 28th he met McCallon, "as I had done on previous occasions, for the purpose of purchasing heroin, and asked him if it would be possible * * * to purchase an ounce of heroin. He told me it would be possible. I asked him how much * * * He said, 'The same as last time' and that amount was $325.00 * * * He told me that—like the previous purchase of Exhibit 3 the week before, that * * * he was going to travel to his source and he wanted to take the money * * *."

This was objected to as hearsay. The court finally ruled: "This objection to that conversation is sustained, between McCallon and the witness, and I'll disregard it. * * *" Thus the only evidence admitted about the April 23 transaction is that set out in the text of my opinion, including that in the affidavit for the search warrant, quoted *infra*. If the agents who made the search knew about the foregoing conversation, there is nothing in the record to show it.

tion at the time that Thomas was arrested except that "we had seen him on more than one occasion, *defendant McCallon* go to this residence for the purpose of purchasing heroin." (Italics mine.) The court granted a motion "to strike that" (what?) as a conclusion on the part of the witness.

When Herring prepared the affidavit for the search warrant he "knew he was living at 1319 West 68th Street, is that correct, Mr. Thomas? Answer: Yes."

The foregoing is all of the testimony in the record regarding the identity of Thomas, except for the affidavit in support of the search warrant, which is as follows:

"On April 17, 1969, I saw defendant John Doe, aka John Brooks, leave 1121 W. Vernon, Apt. 2, go to 1345 W. 41st St., enter the residence at that location and then return to 1121 W. Vernon. Where, I am informed by Agent Charles R. Henry, Brooks sold 11.495 grams of heroin for $150 Official Advanced Government funds. After purchase Brooks returned to 1345 W. 41st St. On April 23, 1969, I saw John Brooks leave 1121 W. Vernon, Apt. 2, and again went to 1345 W. 41st St. He entered the residence at that location. He then exited the residence accompanied by a male negro. The two persons then went to 1319 W. 68th St., Los Angeles, California. They entered the residence at that location. After a few moments they exited this location and both returned to 1345 W. 41st St., and the unidentified male negro went into that location. Brooks returned to 1121 W. Vernon, Apt. 2, where, I am informed by Agent Henry he delivered 16.280 grams of heroin to Agent Henry. He had previously been given $325 Advanced funds by Agent Henry prior to his leaving the Vernon address."

If the foregoing affidavit can be taken to identify the residence of Thomas in any way, it points as much to 1345 W. 41st Street as to 1319 West 68th Street. Of course, it may not refer to Thomas at all. It does mention a male negro, and the record does show that Thomas is a male negro. But the behavior of the male negro described in the affidavit indicates that he visited 1319 West 68th Street once, but that he came from 1345 West 41st Street, went with McCallon to 1319 West 68th Street, left that address with McCallon and returned to 1345 West 41st Street, and apparently stayed there. If that shows anything, it would seem that his residence was the 41st Street address. It is interesting, too, that the affidavit refers only to "a male negro" and "the unidentified male negro."

If there were a shred of evidence in the record indicating that the various surveilling agents other than Kennedy, who did not testify, had ever seen Thomas, or that Agent Kennedy, who had seen "Thomas" come in or out of 1319 West 68th Street, had given Ozment and Herring or the agents accompanying them a description of Thomas, and the agents had relied, in addition to the facts testified to, upon such knowledge, we might have a very different case; but there is no such evidence. I find no significance in the use of the name "Mr. Thomas" here and elsewhere in the testimony. So far as the record shows, all that the agents knew on the basis of which they used the name before the search, if they did then use it, is that the Post Office Department said that someone named Thomas lived at the house. I think that it can fairly be inferred from the record that the testifying agents, who knew who Thomas was and what he looked like when they testified, because he was charged and sitting in the courtroom, used the name as a shorthand expression. The government had the burden of proof, United States v. Cleaver, 9 Cir., 1968, 402 F.2d 148, 151; it has not sustained that burden.

So far as the agents knew, the man whom they saw come out of the house could have been a casual visitor, a repairman, a burglar, or what have you. I do not think that is enough to give them probable cause. In what I think is a comparable case, Judges Barnes, Jert-

berg and McNichols didn't think it was enough either. See Mangaser v. United States, 9 Cir., 1964, 335 F.2d 971, 974:

"The officers had probable cause to believe that an offense had been committed, but that is not enough. They had no probable cause to believe that these appellants had committed it."

However, because the case was quite informally tried, I would not order dismissal.

I would reverse and remand for a new trial.