UNITED STATES of America
v.
Fairh RIGGS, Defendant.
No. 71-CR-1047.

United States District Court,
E. D. New York.

Aug. 8, 1972.

Robert A. Morse, U. S. Atty., Eastern District of New York, for the United States; Joseph W. Ryan, Jr., Asst. U. S. Atty., of counsel.

Henry B. Rothblatt, New York City, for defendant; Stephan H. Peskin, New York City, of counsel.

BARTELS, District Judge.

Defendant Fairh Riggs moved this court for an order pursuant to Rule 41, F.R.Crim.P., 18 U.S.C., to suppress all evidence obtained, directly or indirectly, from her detention, search and arrest at the LaGuardia Airport on September 26, 1971. Extensive hearings on the motion were held on December 27, 28, and 29, 1971, and May 11, 1972. The Government offered testimony of two Deputy United States Marshals, a New York Port Authority Police Detective, three American Airlines supervisors at LaGuardia Airport and one at Detroit Metropolitan Airport, an American Airlines Security Officer at LaGuardia Airport, two Correction Officers of the New York City Department of Correction, a detective of the Michigan State Police, and a ticket salesman for American Airlines at LaGuardia Airport. The defendant offered her own testimony.

The central issue presented is whether the two Marshals, Allen R. Huttick and David O'Flaherty, were justified in forcibly stopping defendant Riggs on an American Airlines boarding ramp at LaGuardia Airport just prior to departure for Detroit, Michigan, for the limited purpose of identifying her on the ground that they reasonably suspected her of committing the felony of possessing narcotics, and on the additional ground that she was a potential danger to aircraft security. For reasons set forth below, the court believes that the jetway stop of the defendant at LaGuardia Airport and her subsequent arrest arising

from a discovery of narcotics on her person was lawful, and accordingly the court denies defendant's motion to suppress.

*Facts*

On the morning of September 26, 1971, the defendant Riggs, a young female Negro wearing a brilliant orange coat and large gold hoop earrings, carrying no luggage, purchased three one-way airplane tickets at Detroit for an American Airlines flight from Detroit to New York, paying for them with cash from a brown paper bag filled with money. She was accompanied by two Negro males, and her ticket was purchased in the name of "P. Griggs." The circumstances surrounding the purchase were deemed suspicious by the airline officials in Detroit, and the supervisor testified that she was a selectee pursuant to the Federal Aeronautics Administration (F.A.A.) "behavioral profile" system. Accordingly, Riggs was stopped by the supervisor before boarding the flight and asked for some identification. At first she denied having identification but subsequently she gave the supervisor "some identification." What this consisted of he was unable to say. Upon inquiry as to what she had in the paper bag, she told the supervisor it was her lunch. With her permission, the supervisor, as a security precaution, looked into the brown paper bag and found, instead of lunch, a large amount of money. She was nevertheless permitted to board the flight but thereafter the supervisor reported the incident to Detective William R. Schmidt of the Michigan State Police, located at the airport. Schmidt, in turn, checked the name of "P. Griggs" with the Michigan State Police, the Detroit Police Department's Narcotics Section, and the Federal Bureau of Narcotics and Dangerous Drugs. He received a report on one "Cynthia Joyce Griggs" and he testified that he believed "P. Griggs" to be "Cynthia Joyce Griggs," a young female Negro who, according to the reports he had received, was a known drug dealer arrested at least twice for possession of narcotics,

the first arrest resulting in a dismissal because the principal witness against her was a homicide victim, and the second arrest involving the seizure of three handguns and a shotgun in the apartment in which she was staying. "Cynthia Joyce Griggs" also, according to the report, had an alias of "Betty Jackson," and was presently out on bail on another arrest.

Detective Schmidt then alerted Detective Stone of the New York Port Authority Police at LaGuardia Airport that a young female Negro wearing a brilliant orange coat and large gold hoop earrings who had purchased three one-way tickets and paid for them in cash from a paper bag filled with money, accompanied by two male Negroes, would arrive at LaGuardia Airport at 11:40 A.M. Schmidt also transmitted to Stone all the information he had collected about "Cynthia Joyce Griggs," and also told Stone that "She might be suspected of possibly carrying a gun because of her association—on her last arrest, it might be something to look out for." On the basis of this information, Stone assigned two plainclothes Port Authority policemen, who observed all three disembark in New York separately and without luggage from the 11:40 A.M. flight, and leave the airport in two separate taxicabs. Stone thereupon notified the United States Marshals at LaGuardia Airport, and all of the airlines at LaGuardia Airport which fly into Detroit, that a young female Negro wearing a bright orange coat and gold hoop earrings was suspected of having come into New York to make a narcotics buy, along with two young Negro male companions, and that she might possibly be carrying a weapon.

At approximately 1:40 P.M. that same day, while monitoring American Airlines flight 617, LaGuardia to Detroit, American Airlines supervisor Richard Ruckel noticed a young female Negro answering to the description of the person thought to be Griggs, seated in the departure lounge, and verified that she had purchased in the name of "Fairh Riggs" a one-way ticket to Detroit on that flight.

He immediately called Stone and, at Stone's request, called the "U. S. Sky Marshal" at the TWA terminal. Ruckel then advised Marshal Huttick that American Airlines had received information from the Port Authority Police to be on the lookout for a young Negro woman suspected of trafficking in narcotics and possibly carrying a weapon; that a young Negro woman meeting the description transmitted had just arrived at Gate 9 and checked in for passage on a flight to Detroit scheduled to depart at approximately 1:55 P.M.; that the flight was ready for boarding; that the suspect was a selectee under the F.A.A. "behavioral profile" system; and that therefore the Marshals were requested to respond to Gate 9.

Marshal Huttick advised Marshal O'Flaherty, at the TWA gate, that the woman the Port Authority Police were looking for was in the boarding lounge, ready to depart on an American Airlines flight for Detroit, and the airline supervisor had requested them to proceed to Gate 9. Marshal O'Flaherty already knew from reading a notice posted by Deputy United States Marshal Ron Ehnes on the U. S. Marshal bulletin board that the Port Authority Police were looking for a Negro woman wearing a brilliant orange coat and gold earrings and carrying a large amount of money, arriving from Detroit. Marshals Huttick and O'Flaherty proceeded to Gate 9, where they noticed that Riggs, satisfying the above description, had entered the jetway or connecting link between the lounge and the aircraft. As Riggs was about to step into the aircraft from the jetway, she was stopped by the Marshals, who identified themselves, and requested her flight ticket, which bore the name of "Miss F. Riggs." She was then asked for some identification, such as a license or a voter registration, to verify the name on the ticket, and in order to facilitate boarding of other passengers onto the plane, she was simultaneously escorted towards the beginning of the jetway. The door between the jetway and the lounge was closed, but the door between the jetway and the aircraft remained open. Riggs and the two Marshals were alone in the jetway.

In order to present her identification credentials, Riggs placed a leather camera case, which she was carrying, on the floor of the jetway, near her feet, and then "cracked open" a black snaplock purse, which she was also carrying, and produced a utility bill of the Detroit Edison Company addressed to "Farah Jackson." O'Flaherty thereupon demanded a better form of identification. Riggs again opened her purse, but this time all the way (approximately six inches at the mouth), enabling Marshal Huttick to observe "a clear plastic bag with a white substance inside on top of the purse," which the Marshals believed to be heroin. Riggs then appeared to be "very nervous," "fumbled" for a few seconds with her purse, and pulled out a second identification, a letter addressed to "Farah Jackson" from the Detroit Edison Company. O'Flaherty then opened the top of the camera case sitting on the floor and observed two more clear plastic bags containing white powder.[1] At this point the Marshals took Riggs to their office and on the way subjected her to a magnetometer test. No weapon

---

1. Defendant Riggs' account of the jetway encounter differed in material respects. She claimed that she presented a Michigan automobile registration bearing the name of "Fairh Riggs," when asked for identification by the Marshals. She further asserted that when the Marshals thereafter asked for permission to search her belongings, she denied that permission but Marshal Huttick nevertheless searched both her purse and camera over her objection. Because of her fantastic and incredible story as to how she obtained the cash and narcotics found in her possession, this court rejected the defendant's version. Only three months had elapsed between her arrest and the first suppression hearing, and the Marshals' recollection of the encounter appeared fresh in their memory. Finally, the documentary evidence of inventories made by the Women's House of Detention and the testimony of Correction Officer Rayford corroborated the Marshals' account but not the defendant's story.

was found on her person or in her bags, but field tests confirmed that the plastic bags discovered in her purse and in her camera case contained heroin. She was then formally placed under arrest for unlawful possession of narcotics.

At the suppression hearing Detectives Stone and Schmidt testified that defendant "Fairh Riggs" and "Cynthia Joyce Griggs" were two separate individuals; that Griggs, not Riggs, had been arrested at least twice before for possession of narcotics; that the intelligence data obtained from law enforcement authorities in Detroit concerned Griggs, not Riggs, but that the mistake was not discovered until the first suppression hearing, three months after the incident giving rise to the arrest.

## Law

■ In this case the Marshals, before stopping Riggs, did not have probable cause to either arrest Riggs or invade her privacy by a search and seizure of her personal effects. But they did, under the circumstances, have a legal basis to stop Riggs at least for identification purposes. It was the exposure of the white plastic bags containing white powder which they believed to be heroin in her purse, ensuing after the stop and caused by her fumbling, that provided the probable cause for her arrest.[2] The court is not presented here with a frisk or full-blown search of Riggs, nor with any extended detention

or interrogation of her in the jetway. The Government's suspicions for a narcotics violation were based upon the following:

First, the departure of Riggs from the Detroit airport, using the name of "P. Griggs," together with two males, under the suspicious circumstances of carrying no luggage and paying for three tickets with cash taken from a brown paper bag filled with money; second, notification by the Michigan State Police to the New York Port Authority officials that the former believed Riggs to be "Cynthia Joyce Griggs" who was arrested at least twice for narcotics offenses and who might be dangerous; and third, the return of Riggs to the LaGuardia Airport at 1:40 P.M. on September 26, 1971, just barely two hours after her arrival in New York, for a return flight to Detroit, still carrying no luggage, only this time using the name of "Fairh Riggs." For the encounter here challenged the required degree of probability that the defendant might be engaged in some type of criminal activity is much less than that constitutionally required for a probable cause to arrest or search. See LaFave, "Street Encounters" and the Constitution, 67 Michigan Law Review 39, at 40 (1968–69). But there is much more. Riggs satisfied the criteria of the "behavioral profile"[3] developed by the Federal Aeronautics Administration with the cooperation of other law enforcement agencies and commercial airlines.[4] The purported intrusion upon

2. The essence of the probable cause standard to arrest is the presence of evidence "that would warrant a prudent and reasonable man (such as a magistrate, actual or hypothetical) in believing that a particular person has committed or is committing a crime." Sibron v. State of New York, 392 U.S. 40, 75, 88 S.Ct. 1889, 1908, 20 L.Ed.2d 917 (1968) (Harlan, J. concurring). See e. g., Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). No probable cause for arrest could be inferred from the facts and

suspicious circumstances prior to the jetway encounter.

3. For a detailed description of the system's operation, see United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971). The Court of Appeals has recently upheld the constitutionality of both a stop and a frisk predicated upon the profile system. United States v. Bell, 464 F.2d 667 (2d Cir., 1972). The instant case, however, unlike both *Lopez* and *Bell*, simply involved a brief stop, without a frisk until after the arrest of defendant Riggs.

4. Because of the sensitivity of the "behavioral profile" system, this court held part of the suppression hearing *in camera*

this defendant's privacy was, under the circumstances, so minimal and the societal interest in adequately identifying aircraft passengers for protective and record purposes was so clear that the court has little difficulty in upholding the stop in this context. The Marshals therefore had reasonable and objectively articulable grounds to suspect Riggs of both trafficking in narcotics and also posing a threat to aircraft security. Accordingly, they were justified in stopping her for identification and inquiry purposes.

■ Recent Supreme Court decisions have indicated that in order to strike a proper balance between individual and societal interest, police may stop persons on less than probable cause predicated upon objective observation or information from reliable sources which provide them with reasonable grounds to suspect that a person is engaged in criminal activity. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court validated the right of a police officer to make an "on-the-street stop and frisk" for his own protection, even though there was no cause for arrest, when the defendant's conduct led the officer to reasonably conclude from all the circumstances that criminal activity might be afoot and that the defendant might be armed and presently dangerous. This, of course, was not the instant case. However, in its latest decision, the Supreme Court by *dictum* extended this right of police to stop for a limited inquiry even though no weapon was involved. In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the court amplified the *Terry* principle and held that a police officer may justifiably rely upon an unverified tip from a reliable informer, without personal observation, to make a

forcible stop to investigate the activities of a person reported to be carrying narcotics and a concealed weapon. At page 1923, the court said:

> "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. Id., [392 U.S.] at 21–22, [88 S.Ct., at 1879–1880;] see Gaines v. Craven, 448 F.2d 1236 (CA9 1971); United States v. Unverzagt, 424 F.2d 396 (CA8 1970)."

While in the instant case the belief that this defendant might be carrying a weapon rested upon fragile grounds, such a suspicion of weapons is no longer necessary for a brief stop. Indeed, Gaines v. Craven, 448 F.2d 1236 (9th Cir. 1971), cited with approval by the Supreme Court in *Adams,* upheld a limited inquiry of the defendant upon suspicion of possession of narcotics without any suspicion of a weapon.

■ Defendant contends that the brief stop was improper because it was predicated upon misinformation and because actually she posed no reasonable expectation of danger. Only the first contention need be answered since she fell within the profile category. It is true, as it became evident at the suppression hearing, that the information provided by the Michigan State Police was misinformation and that it really applied to a woman named "Cynthia Joyce Griggs" and not the defendant Fairh Riggs. But the court satisfied itself at the hearing that the New York Port Authority Police and the Deputy Marshals acted in good faith on September 26, 1971, when they relied upon the reports of fellow law enforcement officers and airline officials. While sub-

---

with the defendant and the public excluded. Defendant's counsel was present throughout and offered no objection to a brief *in camera* hearing. The evidence adduced *in camera* has satisfied the court that the selection and procedure applied

by the American Airlines was objective, that it complied with the Federal Aeronautics Administration anti-hijacking system, and that defendant Riggs properly fell within the ambit of the profile.

jective good-faith belief alone would not justify the stop, the arrest and the subsequent search, here more than subjective good-faith belief was involved. The New York officials were entitled to assume that the information received by them was reliable, particularly since it was corroborated by other suspicious objective circumstances surrounding Riggs' conduct. See United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Travis v. United States, 362 F.2d 477, 481 (9th Cir. 1966), cert. denied, 385 U.S. 885, 87 S.Ct. 179, 17 L.Ed.2d 113 (1966); United States v. Thoresen, 281 F.Supp. 598 (D.C.Cal. 1967), cf. Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971). Moreover, Riggs was at an airport in the process of boarding a plane about to depart, which would have immediately transported her out of the Marshals' jurisdiction, and the police therefore had no time to verify the information received through official channels. It would be wholly unrealistic for this court to conclude with this background in mind that the Marshals had no basis to stop Riggs for a limited inquiry. See Travis v. United States, *supra*. As noted in Adams v. Williams, *supra* (92 S.Ct. p. 1923):

> "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

▮ Once having been stopped, Riggs then failed, at least in the first attempt, to produce proper identification. In her fumbling second attempt she opened up her purse and unwittingly disclosed to the Marshals plastic bags containing white powder with the appearance of heroin, which immediately gave them probable cause for arrest and the subsequent search and seizure. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Under the circumstances, the motion to suppress must be denied. So ordered.