**UNITED STATES of America,
Appellee,**

v.

**Fairh RIGGS, Appellant.**

**No. 513, Docket 72-2181.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 18, 1973.

Decided Feb. 15, 1973.

Martin D. Dehler, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E.D.N.Y., and Raymond J. Dearie, Asst. U. S. Atty., of counsel), for appellee.

Henry B. Rothblatt, New York City (Rothblatt, Rothblatt, Seijas & Peskin, New York City, of counsel), for appellant.

Before FRIENDLY, Chief Judge, and OAKES and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

The sole question on this appeal from a conviction, in the District Court for the Eastern District of New York, for

possessing two kilograms of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), is the legality of the acts of law enforcement officers that led to the discovery of the narcotics. These included stopping the appellant, Fairh Riggs, at LaGuardia Airport and asking for identification, a consequent "plain view" of a plastic bag containing white powder in her purse and, finally, a search of her camera case which disclosed the two kilograms of heroin. Although the incident arose in the context of a purported anti-hijacking investigation, we sustain the acts of the law enforcement officers on the basis that they had sufficient reason for suspecting Miss Riggs of a narcotics violation to authorize what was done.

On the basis of the testimony permissibly credited by the trial judge in his reported opinion denying appellant's motion to suppress after an extensive hearing, United States v. Riggs, 347 F.Supp. 1098 (E.D.N.Y.1972), the facts were as follows: The events, all occurring on Sunday, September 26, 1971, began with the arrival of Miss Riggs, a young black female wearing a brilliant orange coat and carrying no luggage, at the Detroit Municipal Airport at about 8:45 A.M. She was accompanied by two males. At the American Airlines counter she bought three one-way tickets to New York and paid for them with cash which she produced from a brown paper bag. Her ticket was purchased in the name of "P. Griggs." Since she met the "profile," see United States v. Bell, 464 F.2d 667 (2 Cir. 1972), then being used by American Airlines, the clerk at the counter summoned a supervisor. By the time the supervisor arrived, one of the males had boarded; the other was still near the counter but he and Miss Riggs acted as if they did not know each other.

Both passengers were stopped before boarding the flight and were asked for identification. At first both denied having any, but later appellant produced some identification, perhaps a driver's license, in the name of "Fairh Riggs." The supervisor inquired what was in the brown paper bag; Riggs answered it was her lunch. He asked to check the bag, Riggs opened it, and he saw it was filled with "stacks of money." The supervisor permitted her to board; the male passenger was also allowed to do so, after a frisk. Appellant's counsel conceded at argument that none of these happenings at Detroit violated appellant's Fourth Amendment rights.

Rendered suspicious by all of the above, the airline supervisor related the facts to Detective Schmidt of the Michigan State Police, who was headquartered at the airport. Detective Schmidt testified that the large amount of cash Miss Riggs was carrying, and the unusual way in which she was carrying it, led him immediately to suspect that she was engaged in narcotics traffic. A check revealed that while the state police had no record for "P. Griggs", they did have one for Cynthia Joyce Griggs, also known as Betty Jackson, a young black female who had been arrested in 1966 on a narcotics charge but whose case had been dismissed after the main prosecution witness was murdered. The Detroit Police Department reported that Cynthia Joyce Griggs had been recently arrested with nine other persons on a narcotics charge as a result of a search of her apartment which also turned up three handguns and a shotgun, and that she was currently on bail. The Detroit office of the Federal Bureau of Narcotics and Dangerous Drugs confirmed that Cynthia Griggs was known to them as a narcotics dealer.

Believing, not unreasonably, that the "P. Griggs" ticketed on the flight might in fact be Cynthia Joyce Griggs, Detective Schmidt passed on to Detective Stone of the Port of New York Authority Police at LaGuardia Airport all the information that had been collected. Plainclothesmen dispatched to meet the flight from Detroit reported that the woman had left in one taxi and the two men in another. Detective Stone then notified each of the airlines and the United States Marshal's anti-hijacking detail at LaGuardia of all the above and

of the likelihood that the three might be returning after having made a buy of narcotics; he added, apparently only on the strength of the Detroit Police report, that they might be carrying weapons.

About 1:40 P.M. an American Airlines supervisor at LaGuardia telephoned Detective Stone that a woman fitting the description of P. Griggs had purchased with cash a one-way ticket for a 1:55 flight to Detroit and was in the lobby at Gate 9. Stone instructed the supervisor to call the United States marshals while he and his partner proceeded to the Gate.

The supervisor called Deputy Marshal Huttick, who had been informed of the facts earlier related by Detective Stone; he told Huttick that a woman matching Griggs' description was in the lobby at Gate 9 awaiting a return flight to Detroit, mentioned that on this occasion the ticket had been bought in the name of "Fairh Riggs," and added that she met the "profile." Huttick and his partner O'Flaherty immediately went to Gate 9. Riggs had already entered the jetway, but they stopped her before she boarded the plane. They showed their credentials and said they were making a security check. O'Flaherty asked to see the plane ticket, found it was indeed in the name of "F. Riggs," and asked for some verification. Placing on the floor in front of her a leather camera case which had previously been strapped over her shoulders, appellant opened her purse and produced a utility bill bearing the name "Farah Jackson." O'Flaherty asked for better identification. Appellant again opened her purse, wider this time; both marshals saw on the top a clear plastic bag containing white powder. Riggs fumbled with her purse for a few seconds and pulled out a letter from the utility company also addressed to "Farah Jackson." O'Flaherty then

flipped open the top of the camera case, saw two plastic bags filled with white powder, and money stuck underneath the bags and on the sides.[1] Miss Riggs, her pocketbook and camera bag were taken to the marshal's office, where field tests confirmed that the bags contained 1.9 kilograms of 75% pure heroin. Riggs was then formally placed under arrest.

■ Appellant argues that because the American Airlines "profile" did not quite conform to the Federal Aviation Administration profile discussed in United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971) and United States v. Bell, *supra*, 464 F.2d 667, and because the marshals did not in good faith believe that Riggs constituted a threat to the security of the airplane, there was no justification for anti-hijacking measures. We need not pass upon these arguments, nor on the question, raised in United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972), how clearly the subject of an anti-hijacking search must be warned that he can avoid the search by declining to board the airplane. See also United States v. Bell, *supra*, 464 F.2d at 675 (Friendly, C. J., concurring). For we hold that the Deputy Marshals' request for identification as appellant attempted to board her return flight was justified, under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), by their reasonable suspicion that Riggs was in fact Cynthia Joyce Griggs and had made a purchase of narcotics which she was about to transport to Detroit with a view to distribution, and that their search of her camera case was justified both by the probable cause which they then possessed to arrest her for that crime and by their reasonable suspicion that she might be armed.[2]

---

1. The camera bag was later found by the marshals to contain $4800 in cash.

2. Appellant does not contend that the marshals lacked authority to make an investigatory stop apart from their powers under the anti-hijacking program. There would be no merit in such a contention. 18 U.S.C. § 3053 provides that "United States marshals and their deputies

A number of "specific and articulable facts," Terry v. Ohio, *supra,* 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 provided an adequate basis for the marshals' reasonable suspicion to justify the minimal intrusion upon appellant's privacy represented by a request for identification. We start with her purchase of airplane tickets, with cash taken not from a purse but a brown paper bag, and the efforts of appellant and her two companions to avoid any appearance of recognition. Compare United States v. Canieso, 470 F.2d 1224, 1226, 1230 (2 Cir. 1972). We add her carrying "stacks of money," doing this in a brown paper bag, and lying about the bag's contents to the Detroit airline supervisor. This was enough to create the suspicion that appellant was going to New York on no ordinary errand but on one for which large sums of cash on the barrelhead would be needed—something characteristic of narcotics purchases, as the Michigan state police detective knew from his experience in similar situations. These

suspicions were confirmed when Riggs returned to LaGuardia Airport—only two hours after arrival—with the brown paper bag now accompanied or supplanted by a camera case—and bought a ticket back to Detroit.

Arguably this alone would have sufficed to justify a demand for identification under Adams v. Williams, *supra,* 407 U.S. at 145–146, 92 S.Ct. 1921, 32 L.Ed.2d 612, but we need not so decide. Appellant's eastbound ticket had been in the name of "P. Griggs." The police could reasonably have been suspicious under the circumstances that this was another alias designed to conceal that appellant was really Cynthia Joyce Griggs, with her record of arrests for narcotics offenses and reputation as a narcotics dealer. Appellant's purchase of her return ticket in the name "F. Riggs" only added to the confusion surrounding her real identity. And when, in response to the marshal's initial inquiry, she presented identification in the form of a utility bill addressed to "Far-

. . . may make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States . . . ." Although this statute does not in terms give marshals authority to make investigatory stops, we think that the power to take reasonable law enforcement steps short of, but which may well lead to an arrest can be fairly implied from the grant of powers of arrest. *Cf.* United States v. Krapf, 285 F.2d 647, 650 (3 Cir. 1960). It should be noted that although many states have enacted specific grants of stop and frisk powers since the Supreme Court's decision in Terry v. Ohio, *supra,* the majority of states still do not provide explicit statutory authorization for the stop and frisk, considering these powers to derive from the police's general law enforcement authority. See ALI, A Model Code of Pre-Arraignment Procedure 105–06 (Official Draft No. 1, 1972).

It is true that 28 U.S.C. § 570 provides that "A United States marshal and his deputies, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the

laws thereof," and that the New York stop and frisk law, N.Y.Crim.Proc. Law § 140.50 (McKinney 1971), does not include "sheriffs" within New York City within its grant of authority, see *id.* § 1.20(33), (34). But § 570 should not be construed as a limitation on the powers otherwise possessed by federal marshals, see United States v. Krapf, *supra,* 285 F.2d at 650, particularly in this case since § 3053 is a later statute which was intended to provide congressional authorization for the powers of United States marshals independent of the vagaries of state laws. See H.R.Rep. No. 283, 74th Cong., 1st Sess. 2 (1935). Moreover, § 570 is derived from the Act of February 28, 1795, ch. 36, § 9, 1 Stat. 425, passed at a time when the word "sheriff" referred to the general law enforcement authority of the state. It seems likely that the meaning of "sheriff" in § 570 is properly to be supplied by reference to this congressional understanding rather than by state law; Congress could not have intended that the drastic narrowing of the traditional role of the sheriff, at least in New York City, as his functions were assumed by police officers, should correspondingly reduce the powers of federal marshals.

ah Jackson," a name not tallying either with that on her incoming or her outgoing ticket, this increased the confusion and heightened the suspicion that she might be Cynthia Joyce Griggs, since Michigan State Police records had revealed that the latter also used the alias Jackson. Deputy Marshal O'Flaherty was thus quite justified in demanding further identification—a demand that led to the opening of the purse and the "plain view" of the bag of clear white powder. Adams v. Williams, *supra*, 407 U.S. at 146, 92 S.Ct. 1921, 32 L.Ed.2d 612.

At this time the Deputy Marshals had probable cause to arrest appellant for a narcotics offense. If they had done so, a search of the camera case would have been justified under the "grabbing-distance" principle of Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969). However, Riggs was not formally placed under arrest until after tests confirmed that the white powder was heroin, and the Government does not contend that Riggs was arrested *de facto* prior to the search of the camera case, although we suspect that her chances of being released without being arrested were exceedingly poor. In United States v. Gorman, 355 F.2d 151, 159–160 (2 Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966), we left open the question whether an incidental search which would have been justifiable after an arrest is equally so when there was probable cause for arrest but arrest was postponed; we indicated that, absent controlling contrary authority, of which there then was none, we would follow Mr. Justice Traynor in People v. Simon, 45 Cal.2d 645, 648, 290 P.2d 531, 533 (1955), and uphold such a search. The justification for such an intrusion is the probable cause to believe that the individual has committed a crime and the need for immediate action to prevent the

use of weapons against the arresting officer or destruction of evidence of the crime, see Chimel v. California, *supra*, 395 U.S. at 763, 89 S.Ct. 2034, 23 L.Ed. 2d 685; postponement of the further intrusion of arrest does not remove the justification for the search and in no way prejudices the individual's Fourth Amendment rights. Subsequent authorities have now established that view as firmly as anything short of a Supreme Court decision can. See Bailey v. United States, 128 U.S.App.D.C. 354, 389 F. 2d 305, 308 (1967) (Wright, J.) (dictum); *id.* at 316 (Leventhal, J., concurring); Henderson v. United States, 405 F.2d 874, 875 (5 Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); United States v. Skinner, 412 F.2d 98, 103 (8 Cir.), cert. denied, 396 U.S. 967, 90 S.Ct. 448, 24 L.Ed.2d 433 (1969); United States v. Thomas, 432 F.2d 120, 122 (9 Cir. 1970), cert. denied, 400 U.S. 1022, 91 S.Ct. 587, 27 L. Ed.2d 634 (1971); United States v. Brown, 463 F.2d 949, 950 (D.C. Cir. 1972); United States ex rel. Farrugia v. Bhono, 256 F.Supp. 391 (S.D.N.Y.1966) (Weinfeld, J.). We therefore hold that the marshal's search of the camera case was a valid search based on probable cause for appellant's arrest and the fruits of the search were fully admissible against her.

■ Beyond that, there is another basis for upholding the marshal's cursory examination of the camera case. The plain view of the plastic bag containing white powder, along with the other circumstances we have noted, justified the marshals in detaining appellant for the short interval needed to subject the powder to chemical analysis. *Terry* held that "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he

may conduct a limited protective search for concealed weapons, 392 U.S. at 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, and the Court reaffirmed this in Adams v. Williams, *supra*, 407 U.S. at 146, 92 S. Ct. 1921, 32 L.Ed.2d 612. Here the camera case was on the floor directly in front of appellant; it was unlocked; the top needed only to be "flipped" open to get inside it. If the camera case had in fact contained a weapon, Riggs could have easily and quickly grabbed it. Moreover, the marshal's initial search was carefully limited to the quick inspection of the camera case necessary to determine if it contained a weapon. It may be true, as the district court noted, D.C., 347 F.Supp. at 1103, that "the belief that this defendant might be carrying a weapon rested upon fragile grounds," but courts should not set the test of sufficient suspicion that the individual is "armed and presently dangerous" too high when protection of the investigating officer is at stake. Although the deputy marshals had not received such a specific warning about the present possession of weapons as that in Adams v. Williams, the report of Detective Stone did give reason for fear that Riggs might be carrying a weapon, and their own investigation, during which they had observed her to be carrying what they reasonably and correctly believed to be heroin, and during which she had identified herself with the name "Jackson," tended to corroborate their suspicions that appellant might in fact be the Cynthia Joyce Griggs who was considered dangerous by the Michigan and Detroit police. Finally, that the marshals were in fact genuinely concerned by the possibility that Riggs was armed is confirmed by their actions immediately following the quick check of the camera case; since regulations prohibited them from frisking a female, they walked her through a magnetometer to determine if she were carrying a concealed weapon.

Affirmed.