UNITED STATES of America ex rel.
Russell GRIFFIN and Paul Knapp,
Petitioners,

v.

Leon VINCENT, Superintendent of Green
Haven Correctional Facility,
Respondent.

No. 73 Civ. 441.

United States District Court,
S. D. New York.

April 18, 1973.

David Blackstone, New York City, for petitioners.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, by Hillel Hoffman, Asst. Atty. Gen., for respondent.

POLLACK, District Judge.

Petitioners Griffin and Knapp were convicted on June 18, 1971 of felony murder, robbery in the first degree and assault in the first degree. Each was sentenced to twenty-five years to life imprisonment on the murder conviction, an indeterminate term of twenty-five years on the robbery conviction, and an indeterminate term of fifteen years on the assault charge, the terms to run concurrently. Petitioner Griffin was also convicted of manslaughter in the first degree and assault in the first degree; he was sentenced to additional concurrent indeterminate terms of twenty-five years and fifteen years, respectively, on these other convictions. These convictions were appealed and upheld in the state courts; petitioners are presently in custody of the warden of Green Haven Correctional Facility.

Petitioners now move this Court to issue a writ of habeas corpus, asserting two grounds. First, petitioners contend that the New York City police conducted an illegal search and seizure and that the evidence obtained thereby should have been suppressed at trial. Second, petitioners assert that the testimony at trial of state's witness Michael Williams, which is characterized as the only evidence linking petitioner Knapp to this crime, was perjured, and, therefore, insufficient to support a conviction.

I.  *Search and Seizure*

■  On April 3, 1973, this Court, in its discretion, ordered an evidentiary hearing to be held April 13, 1973 "to determine the facts and circumstances in relation to the search of petitioner Griffin and the seizure of evidence from him, particularly with regard to the stopping of the taxicab in which he was a passenger, the propriety thereof and the applicability thereto of the Fourth Amendment." *See* Lavalle v. Delle Rose, 410 U.S. 690, 701 n. 2, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), (Brennan, J., dissenting); United States ex rel. Clayton v. Mancusi, 326 F.Supp. 1366, 1373 (E. D.N.Y.1971), aff'd, 454 F.2d 454 (2d Cir. 1972); Developments in the Law— Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1138–1140 (1970). This order represents a rare exception to the general principle of directing a federal habeas hearing only when so required by 28 U. S.C. § 2254(d). However, the Court was faced herein with subtle issues of constitutional law lurking potentially in the background, with factual disputes seemingly unresolved in essential totality, and with petitioners sentenced to especially long prison terms. Of dubious necessity at most, a hearing would nonetheless afford petitioners an opportunity to explore every aspect of their apprehension and search properly to be considered under their federal contentions. Counsel was appointed to represent petitioners at the hearing. 18 U.S.C. § 3006A(g).

■  Unless petitioners can show that the state proceedings suffered from any of the defects enumerated in § 2254(d) or, "by convincing evidence that the factual determination by the State court was erroneous," § 2254(d), the state findings are presumed to be correct and it would be improper for a federal court to make new findings on the same matters. A review of its proceedings and decision shows that the state court properly applied constitutional principles and

fairly resolved the disputed issues of fact upon a full and adequate record.[1] Moreover, at the federal hearing, petitioners failed to overcome the presumption of § 2254 that the state court's findings of fact were correct; indeed, the evidence adduced at that hearing squarely confirms the state's version of the facts accepted by the state judge in his findings.

The basic fact pattern of the case can be stated as follows. At about 4 P.M. on Saturday, September 12, 1970, Michael Frank and Waldo Howell, employees of a branch of Woolworth's, were carrying the store's money, amounting to $13,000, to a night depository of the Irving Trust Company, located at Madison Avenue and East 39th Street in Manhattan. While at the depository, they were approached by a man with a gun, who ordered Howell to drop the money bags. When Howell hesitated, the man knocked the bags away. Both employees bent down to retrieve the money; shots were fired by the robber, killing Frank and wounding Howell.

At about 4:15 that day, cab driver Kenneth Murray hailed Patrolman William Casey, who was standing on 49th Street and 5th Avenue and told him that the passenger in the cab then in front of Murray's cab was one of two men who had fled in opposite directions, in the 43rd Street and Madison Avenue area, the scene of a purported automobile accident. Casey and his partner, Patrolman Peter Curley, entered Murray's cab, instructing Murray to overtake the other cab, which he did. Curley and Casey got out of Murray's cab, went to the other cab and Casey spoke to the passenger. In the course of the events that followed, the officers took from petitioner Griffin, who was the passenger, a gun later established to be the murder weapon and money bags marked "Irving

Trust" and "WOOL" containing $13,000, which were in a plastic bowling bag.

An automobile accident had, in fact, occurred in the vicinity in that time period, although not involving petitioners.

The state's version of the facts of the investigation as given by the officers, properly accepted by the trial judge, is that upon overtaking the cab containing Griffin, Officer Casey commenced some routine questioning. Casey perceived that Griffin appeared nervous and responded equivocally with regard to any involvement in an auto accident. Casey noticed that Griffin's hand was skinned or bruised. Griffin claimed he carried no evidence of identification. At this point, when circumstances began to corroborate Murray's report, Casey asked Griffin to step out of the cab, and Griffin complied by getting out on the traffic side of the cab and bringing with him a plastic bowling bag. Within moments thereafter a report came over Curley's walkie-talkie radio to the effect that a robbery and attempted murder had occurred in the 17th Precinct, the vicinity of the purported automobile accident, and that the perpetrators had fled the scene. Murray, the informant, on hearing this report over Curley's radio asked that his identity be kept from the passenger ahead, stating in effect that Griffin might be the wanted felon. After hearing the report, Curley called to Casey, telling him, "I think he's [Griffin] wanted for a shoot-out in the 17th Precinct." Griffin tensed visibly and made a sudden reach toward his inside pocket. The officer reacted by stopping Griffin's hand, saying "I thought you said you had no identification," and receiving no response and suspecting some danger to his safety, he then frisked the area where Griffin reached, finding the gun. Griffin was then placed under arrest, was hand-

---

1. Before commencement of petitioners' trial, a full and fair suppression hearing was held on April 15, 1971, at which time the testimony of the arresting officers and of petitioner Griffin was received. At the conclusion of this hearing, the judge credited the testimony of state's witnesses and ruled the evidence to be properly admissible. His findings and conclusions are set out in the Appendix hereto.

cuffed, and the officers unzipped his bowling bag, discovering the money bags within.

Griffin testified that the officers took positions on either side of the cab and ordered Griffin to leave the cab at once and, in doing so, he cut his hand. He claimed he equivocated about his involvement in an auto accident because he confused the question about an "accident" as a reference to the cut on his hand. He claimed he denied any involvement in an auto accident and said that without further ado the officers searched his bowling bag, where the money was found, and his person, where the gun was found and seized. Griffin denied that either officer had a walkie-talkie and averred that neither had received an alarm concerning a robbery or shoot-out.

Murray, the cab driver, was called to the stand at the federal hearing and testified unequivocally that a walkie-talkie was in operation, and he corroborated the police testimony of the robbery and shooting alarm.

■■■ The investigation by officers Curley and Casey proceeded from a reasonable suspicion that an automobile accident involving petitioner Griffin had occurred and that Griffin was leaving the scene of such an accident without filing proper reports. *See* New York Vehicle and Traffic Law § 600, McKinney's Consol.Laws, c. 71. When cab driver Murray hailed the officers and gave his report he provided a sufficient basis for making an immediate routine inquiry before Griffin left the area. An informant who accompanies the police to a confrontation with the accused is unlikely to be perpetrating a deliberate fabrication, People v. Moore, 32 N.Y.2d 67, 343 N.Y.S.2d 107, 295 N.E.2d 780 (1973), especially since civil or criminal liabilities may exist for inducing a false arrest. Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612

(1972). This is more particularly true where the informant is a cab driver, whose professional status—and perhaps even his hack license—might be endangered by a false report to purposely mislead police officers. While Murray's information may not have provided probable cause for an arrest then and there, it provided a rational basis for an investigatory stop, routine inquiry and request for identification. This was a limited, reasonable and permissible intrusion into petitioner Griffin's rights. *See* People v. Moore, 32 N.Y.2d 67, 343 N.Y.S.2d 107, 295 N.E.2d 780 (1973); United States v. Scheiblauer, 472 F.2d 297, 300 (9th Cir. 1973). As the Supreme Court recently stated in Adams v. Williams, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972):

> In *Terry* [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.*, at 22 [88 S. Ct., at 1880]. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

In the situation facing officers Curley and Casey, the "essence of good police work" required the "intermediate response" of stopping Griffin for routine questioning, to verify, refute, and generally probe the cab driver's report. The alternative was to allow the suspect to escape all present and likely future investigation.

Even if the cab driver's report proved, in retrospect, to be mistaken,[2] that is

---

2. Murray was only partially mistaken. Michael Williams, who was in a car following petitioners from the scene of the

murder, collided with a taxicab during his pursuit. Murray saw the scene of that accident and saw petitioners running from

not dispositive of the validity of the stop. United States v. Riggs, 347 F. Supp. 1098, 1103 (E.D.N.Y.1972), aff'd 474 F.2d 699 (2d Cir. 1973). The test of "reasonable suspicion" is applied through the perspective of the officers at the time of the investigation, not through the luxury of retrospective contemplation. Indeed, the entire thrust of the federal exclusionary rule, see, e. g., Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), focuses not on afterthoughts concerning a stop or search but rather on the contemporaneous appearances and reasonable impressions or thoughts of the investigating officers. It is a "means" oriented test; the procedure, not the product, of the search controls the question of legality.

Once the cab containing Griffin was stopped and the questioning commenced, the actions and responses of the officers fully comported with constitutional requirements. See Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Griffin's initial admission that he was involved in an accident and his subsequent denial thereof, his bruised hand, his equivocations during the routine questioning fairly conducted, and his statement that he carried no means of identifying himself served to heighten and to confirm the belief of the officers that Griffin had probably been involved in a hit-and-run accident; such corroboration added support to the informant's report and justified further inquiries. Cf., United States v. Canieso, 470 F.2d 1224, 1230 (2d Cir. 1972); United States v. Carneglia, 468 F.2d 1084, 1089 (2d Cir. 1972).

Thereafter, the physical reaction of Griffin to the radio alarm, repeated in his presence—a sudden reach inside his jacket which he earlier said contained no identification—put the policeman on alert for his own safety and represented suspicious conduct in the circumstances,

properly found by the state court to be an adequate basis for checking that movement to his pocket and for thereafter patting down Griffin's pocket. Terry v. Ohio, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether or not the content of the radio report would have provided the officers with probable cause justifying a search, see Whiteley v. Warden, 401 U.S. 560, 565–567, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971), the officer's reasonable perception of danger to his own safety validates the frisk and —upon discovery of an object in the pocket similar in size and shape to a weapon—the seizure of the gun. When the loaded gun was found, the officers rightly placed Griffin under arrest, at this point having probable cause to suspect his involvement not in an auto accident but in the more serious crime of possession of a weapon, and opened Griffin's bowling bag which was within the "grabbing distance" of Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). See United States v. Riggs, 474 F.2d 699 (2d Cir. 1973); compare United States v. Mehciz, 437 F.2d 145, 147 (9th Cir.), cert. denied, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971), with United States v. Johnson, 467 F.2d 630, 639 (2d Cir. 1972); cf., Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). This quick examination was a reasonable one, limited in scope and incident to a contemporaneous arrest. Id.

■ Petitioners contend that if the investigation conducted herein is viewed as a stop and frisk then it was not authorized by the then applicable New York statute, which did not specifically refer to the misdemeanor of leaving the scene of an accident without identifying themselves and filing proper reports. See N.Y.Code of Crim.Proc. §§ 180–a, 552. This purported error under state law does not rise to constitutional levels. However, even apart from a statutory

---

it. His logical conclusion was that Griffin was fleeing the accident, when, in fact,

Griffin was still attempting his escape from the vicinity of the murder.

grant of authority, police officers have inherent investigatory powers, United States v. Riggs, 474 F.2d 699, 703, n. 2 (2d Cir. 1973), which were exercised properly herein. In any event, the literal text of the New York statute has been held by the state courts as *not* imposing absolute limits to a police officer's authority. People v. Rosemond, 26 N.Y.2d 101, 103–104, 308 N.Y.S.2d 836, 257 N.E.2d 23 (1970).

The Court finds that no violation of Fourth Amendment rights occurred and, accordingly, petitioners are entitled to no relief based on this ground.

## II. *Sufficiency of Williams' Testimony*

The thrust of petitioners' second point is that Williams' testimony as a witness on the trial was so implausible and so much at variance with other testimony as to be, of necessity, perjured.

■ In reviewing a petition from a state prisoner, a federal court will not evaluate the sufficiency of evidence, unless so gross a deficiency is shown as to constitute a deprivation of due process. Freeman v. Stone, 444 F.2d 113, 114 (9th Cir. 1971). Thus, in United States ex rel. Morton v. Mancusi, 393 F.2d 482, 483–484 (2d Cir. 1968), cert. denied, 393 U.S. 927, 89 S.Ct. 262, 21 L.Ed.2d 264 (1968), the Court held:

> Appellee argues that the District Court properly issued the writ because the State failed to meet its due process burden of establishing guilt beyond a reasonable doubt. There is no such constitutional burden; it is sufficient that a defendant is given a fair trial in accordance with constitutionally permissible rules of procedure. The contention that a federal court should, in a collateral proceeding, review the evidence adduced at the state trial to determine if it was sufficient to sustain a conviction has been rejected many times.

*See also* United States ex rel. Griffin v. Martin, 409 F.2d 1300, 1302 (2d Cir. 1969); United States ex rel. Zavarro v. Commissioner of Corrections, 345 F. Supp. 809, 813 (S.D.N.Y.1972); United States ex rel. Williams v. Follette, 313 F.Supp. 269 (S.D.N.Y.1970).

■ Challenges to a witness' credibility are not cognizable in a federal habeas proceeding. United States ex rel. Rodriquez v. Casscles, 72 Civ. 3890 (MP) (S.D.N.Y. Nov. 2, 1972); Smith v. Slayton, 340 F.Supp. 236, 238 (W.D. Va.1972).

At trial, witness Williams was fully cross-examined and the jury was able to weigh the credibility of his testimony as well as to measure such testimony against the sworn statements of other witnesses.

■ Moreover, close scrutiny of the petition submitted herein and of the lengthy trial transcript convinces the Court that the testimony of Williams was not so insufficient as to constitute a denial of due process to petitioner Knapp. "A fair trial in accordance with constitutionally permissible rules of procedure," *Morton, supra,* was held, at which the issues of credibility were reasonably and properly resolved by the triers of fact. There is no basis in this record for finding that Williams' testimony was perjured or that the evidence supporting the conviction was not constitutionally sufficient.

Therefore, this second ground for relief lacks merit.

The foregoing shall constitute the Court's findings of fact and conclusions hereon.

The petition is in all respects denied.

So ordered.

## APPENDIX

## FINDINGS AND CONCLUSIONS OF THE STATE TRIAL COURT

*Findings of Fact:*

Upon the credible evidence adduced before me I find:

(1) That on September 12, 1970, at about 4:15 P.M. pursuant to information supplied by a taxi driver to the effect that the defendant, then a passenger in another taxicab, had been involved in a hit and run accident, Pa-

trolman Casey and his partner, Patrolman Curley, entered the taxicab of the informant, and pursued the taxi in which the defendant was a passenger, and brought it to a halt.

(2) That in answer to Patrolman Casey's questions the defendant equivocated as to his involvement in an accident, and upon request was unable to furnish evidence of his identification.

(3) That the defendant was requested to emerge from the taxi, and in so doing carried what appeared to be a bowling bag, People's Exhibit 4 in Evidence.

(4) That while on the sidewalk with the defendant, Patrolman Curley received a radio alarm that a shooting had occurred in which two persons were shot, and that the perpetrators were fleeing from the scene.

(5) That Patrolman Curley conveyed the information of the shooting to Patrolman Casey.

(6) That the defendant then reached for his pocket, at which time Patrolman Casey grabbed the defendant, patted him down, felt a hard object that felt like a revolver, and in searching the defendant removed a revolver, People's Exhibit 1 in Evidence from the defendant's pocket, and three live cartridges, People's Exhibit 3 in Evidence.

(7) That at the scene, upon examination of the contents of the bowling bag, Patrolman Casey observed a money bag with the name Irving Trust Company on it.

(8) That the defendant was taken into custody at the scene, and on the way to the police precinct identified himself as John Smith.

(9) That at the precinct the bag was further examined, and its contents revealed three money bags with the label of the Irving Trust Company and Wool on them, and the contents of the money bags revealed the sum of thirteen thousand dollars in United States Currency.

(10) That Patrolman Casey had no warrant of arrest or search warrant.

*Conclusions of Law:*

I conclude,

(a) that the police officers had the right and authority to question the defendant for the purpose of a routine investigation relative to an alleged hit and run accident.

(b) That in the course of investigating a hit and run accident the police officers learned that a felony had been committed.

(c) That the defendant's equivocation in answering, relative to his involvement in an accident, his failure to produce any evidence of his identity, the information that a shooting had occurred and the perpetrators were in flight, and the action of the defendant in reaching for his pocket, gave Patrolman Casey reasonable grounds to suspect that the defendant was one of the perpetrators, and that he was in danger of life or limb; that under the totality of the circumstances, the officer's frisking the defendant, and the removal of a revolver and cartridges from his person was lawful and justifiable, and not violative of the defendant's constitutional rights against unlawful search and seizure.

(e)* That the arrest of the defendant was lawful and justifiable upon the discovery of a weapon upon him.

(f) That the search of the bag, without a warrant both at the scene and at the precinct were incidental to a lawful arrest, and not violative of the defendant's constitutional rights.

(g) That the People may offer in evidence at the trial the revolver, cartridges, bag and contents, together with any other items seized from the defendant.

Accordingly, the motion to suppress is denied.

---

* There is no paragraph (d) in the state court record.